Carl MASSEY, Plaintiff-Appellee,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant-Appellant.

No. 15823.

United States Court of Appeals Sixth Circuit.

April 30, 1965.

As Amended on Denial of Rehearing June 7, 1965.

Dan Jack Combs and Ronald W. May, Pikeville, Ky., for appellant.

John C. Eldridge, Washington, D. C., John W. Douglas, Asst. Atty. Gen., Alan S. Rosenthal, Stephen B. Swartz, Attorneys, Department of Justice, Washington, D. C., George I. Cline, U. S. Atty., Lexington, Ky., on brief, for appellee.

Before O'SULLIVAN, Circuit Judge, WEINMAN, District Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

The Secretary of Health, Education and Welfare appeals from the judgment of the District Court for the Eastern District of Kentucky reversing the decision of the Secretary and directing that Carl Massey, appellee, be found entitled to the payment of disability benefits under the Social Security Act, in accordance with his application therefor. Appellee's claim had been denied by the Hearing Examiner, and, after denial of review by the Appeals Council, the Secretary had adopted the Hearing Examiner's finding.

The Secretary contends that Massey has not proved that his disability has precluded him from substantial gainful employment; that substantial evidence was introduced to show that there were jobs reasonably available to Massey which he was capable of performing; and that the District Court erred in holding that such job opportunities must not only be available to a person who can do only what the applicant can do, but that such job opportunities must also be available in the general area in which applicant lives.

Appellee commenced work as a coal miner when he was sixteen years old and continued work in the coal mines for thirty-five years until, according to his contention, he became disabled, after which he filed his claim for disability benefits.

The earliest medical evidence in this case is a report submitted to the Kentucky Workmen's Compensation Board by Dr. M. D. Flanary of Pikeville, Kentucky, dated February 2, 1949, which showed that appellee's foot and ankle were swollen and inflamed by reason of a fracture of the os calcis with no displacement of the fragments. Appellee was admitted to the hospital on January 14, 1949, and discharged January 25, 1949, and was expected to be able to resume regular work within eight to ten weeks. As a result of this injury, appellee received compensation for twenty-nine weeks for temporary total disability, and was also compensated for ninety-five weeks at $2.70 per week for 15% loss of use of the right foot.

Later, on May 30, 1960, Massey's family physician, Dr. C. B. Pergrem of Elkhorn City, Kentucky, filed a report in connection with appellee's application for disability benefits under the Social Security Act, wherein he reported that appellee was blind in one eye, and that the vision in the remaining eye was very poor. Dr. Pergrem further reported that appellee had acute respiratory attacks which he characterized as "smothering practically all the time"; that he had emphysema, dyspnea and angina on slight exertion; also tachycardia, and a moderately enlarged heart, as well as hypertension, and that his condition was static. Dr. Pergrem concluded his report by stating: "This man is unable to work at anything that he may earn a living— so for all practical purposes he is totally disabled."

On June 23, 1960, the Welfare and Retirement Fund of the United Mine Workers of America had appellee examined at one of the Miners Memorial Hospital Association hospitals. X rays revealed generalized pulmonary fibrosis with micro-nodular and macro-nodular shadows, representing pneumoconiosis. A specimen of urine revealed a rare white blood count.

At the request of the Kentucky State Bureau of Vocational Rehabilitation Services, appellee was examined on June 29, 1960, by Dr. Francis H. Hodges at Pikeville, Kentucky. Blood pressure was 104/80. Pulmonary function studies were done and vital capacity was 3,186 cc's with a predicted normal of 3,585 cc's; the maximum breathing capacity was 60.75 liters per minute with a predicted normal of 104 liters per minute. X ray of the chest showed marked increase in fibrosis throughout the lung area of both lungs. There were some areas of increased radiolucency suggestive of possible early emphysema. Dr. Hodges remarked that the marked changes in the lungs were consistent with possible early pneumoconiosis as often seen in coal miners. While Dr. Hodges observed that appellee

did not appear to be functionally disabled to any marked degree, he stated he probably had chronic bronchitis, with marked debility, chiefly due to the inability to expectorate the sputum which accumulated in his bronchial tree.

On October 4 of 1960, appellee was examined by Dr. W. C. Hambley of Pikeville, Kentucky, in connection with appellee's application under the federal disability insurance law. Dr. Hambley, at that time, submitted a form medical report, and later testified for the appellee in a workmen's compensation case on the basis of his findings made in the October 1960 examination and subsequent examinations. In the form medical report, Dr. Hambley's diagnosis was: Blind left eye, with other eye defective; pneumoconiosis; early stage and mild osteoarthritis of the spine. Dr. Hambley thereafter was a witness in the compensation case, which involved a claim made by appellee for workmen's compensation against his former employer, the Blue Diamond Coal Company. In that case, Dr. Hambley testified before the Kentucky Workmen's Compensation Board that, on physical examination, at rest, appellee showed no unusual findings, but that, however, on chest X ray, appellee had generalized pulmonary fibrosis with fine nodulation which is consistent with a diagnosis of second stage silicosis. The diameter of the nodules was estimated as being from two to three millimeters. Dr. Hambley further testified that the subjective complaint of appellee was consistent with, or would corroborate the findings on chest X ray; that X rays made in November of 1961 revealed more definite nodulation than the 1960 X ray; and that he could not recommend appellee for employment to a prospective employer for coal mining or manual labor. When asked if appellee could do any type of work, Dr. Hambley answered: "Not manual work, he could do light work or work in conditions where there wasn't any demand upon his time so that he would have to be under forced work conditions. This man changes in barometric pressure and those things just make it impossible for him to be reliable."

Of particular importance is the medical report of Drs. S. G. Davidson and Henry F. Warden, Jr., of the Bluefield Sanitarium Clinic in Bluefield, West Virginia, which evidence was given in deposition form at the request of the appellee's employer for the purpose of refuting appellee's workmen's compensation claim. Dr. S. G. Davidson testified that he made stereoscopic films of appellee's chest on October 5, 1961, and that he found bilateral nodular fibrosis scattered throughout both sides of the chest with some enlargement of each hilar region; and that, in his opinion, he was suffering from second stage silicosis. Dr. Henry F. Warden, Jr. testified that it was also his conclusion that the appellee was suffering from second stage silicosis, and that pulmonary function studies showed a total vital capacity of 2,425 cc's with a predicted vital capacity of 3,645 cc's, or 67% of predicted vital capacity, and that maximum breathing capacity was 64 liters with a predicted maximum breathing capacity of 107 liters, or 60% of predicted maximum breathing capacity. *He also found evidence of emphysema.* As a conclusion, solely, of this study of *pulmonary function*, Dr. Davidson and Dr. Warden stated that appellee had a "restrictive ventilatory insufficiency with 20% disability to do work." Dr. Warden said that he would not recommend that appellee return to work inside a coal mine, but could do "light physical work outdoors." Dr. Warden further stated that he would recommend claimant be hired in "light manual work. This man could lay brick, he could do a lot of things that would not require strenuous effort." Of course, Dr. Warden, in making this statement, was concerned only with the pulmonary condition.

In September of 1962, appellee was examined at the Harlan Memorial Hospital at Harlan, Kentucky, at the request of the appellant Secretary. A physical examination was performed by Dr. Andres Alonso. Dr. Alonso's impressions were: 1) pulmonary fibrosis, 2) slight reduction

in hearing bilaterally, and 3) enucleation of the left eye. Chest X rays were interpreted by Dr. T. D. Simmons as showing "mild generalized pulmonary fibrosis, compatible with the diagnosis of simple occupational pneumoconiosis." Dr. William H. Anderson performed pulmonary function studies which revealed a measured vital capacity of 2,600 cc's as compared with a predicted vital capacity of 3,530 cc's; and a maximum breathing capacity measured at 85 liters per minute compared with a predicted maximum breathing capacity of 101 liters per minute.

As bearing upon Massey's claimed disability, we cannot ignore the fact, and the evidence in the case discloses, that, on March 19, 1962, he and the Blue Diamond Coal Company entered into an agreement settling his claim for workmen's compensation, and submitted such agreement to the Kentucky Workmen's Compensation Board. The agreement stated that, commencing November 27, 1959, Massey had become disabled from silicosis, and that the disability amounted to *"70% permanent partial disability to the body as a whole"*; and it was agreed that Massey would receive from the company, as compensation, the sum of $18.90 weekly for four hundred weeks. This agreement was approved by the Kentucky Workmen's Compensation Board on April 3, 1962. It is to be pointed out that the date of Massey's disability, resulting from silicosis while working for the Blue Diamond Coal Company, commenced November 26, 1959. His claim for disability benefits under the Social Security Act was filed May 17, 1960.

All of the foregoing was part of the evidence on the hearing of appellee's claim for disability benefits under the Social Security Act.

In his argument and brief on appeal, the Secretary refers to a report to the House of Representatives Committee on Ways and Means, submitted by its subcommittee, on the administration of the Social Security laws, in which it states:

"In interpreting the words of the law which state that any individual must 'be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment' the Bureau has held that there must be both lack of capacity to do a job and that the individual's impairment must be the primary cause of this lack of capacity. The regulations are not any more specific in this area but an OASI pamphlet (OASI—29F) has stated that:

"'A person may become unemployed or remain unemployed for a number of reasons other than disability: individual employer hiring practices, technological changes in the industry in which the applicant has ben employed, local or cyclical business or economical conditions, and many others. The disability provisions are intended to benefit only those persons who are not working because of incapacity, and not those unemployed because of these other factors.'"

In regard to the foregoing, it is to be emphasized that Massey was not unemployed because of individual employer hiring practices, technological changes in the industry in which he had been employed, local or cyclical business or economic conditions, or for other similar reasons. The reason why Massey was unemployed was because of his incapacity to work, because of physical impairment.

There was no doubt whatever of Massey's disability to work in a mine—the only work he had ever performed—and in which he had been engaged for thirty-five years. We recall, then, the evidence of Massey's family doctor that, in May, 1960, as has been stated, Massey was suffering from acute respiratory attacks, characterized as smothering practically all the time, and that he also suffered from emphysema, dyspnea, angina on slight exertion, tachycardia, moderately enlarged heart, and hypertension; and that the foregoing was the basis of one physician's judgment that Massey was unable to work at anything at which he

might earn a living, and that, for all practical purposes, he was totally disabled. We have before us also the testimony from another medical witness that Massey suffered from pneumoconiosis,[1] early second stage, and mild osteoarthritis of the spine, generalized pulmonary fibrosis with nodulation consistent with second stage silicosis;[2] that he could not be recommended as a prospective employee for coal mining or manual labor; that, while he could not do manual work, he could do light work when there wasn't any demand on his time, so that he would have to be under "forced work conditions"; and that changes in barometric pressure made it impossible for him to work in any reliable way. Moreover, witnesses adverse to Massey's claim, even for workmen's compensation, found nodular fibrosis scattered through both sides of his chest, with enlargement of hilar region; that he was suffering from second degree silicosis; that his pulmonary capacity was only 65% of normal; that his breathing capacity was only 60% of normal; and that he showed evidence of suffering from emphysema.

All of the doctors reported also on the fact that Massey had lost an eye, which, he had testified, resulted from an explosion. One doctor said that Massey had poor vision in the other eye; another doctor said the remaining eye was defective; and another doctor said he had corrected visual acuity of 20/100 in the remaining eye; other doctors referred to his having "enucleation" of that eye.

None of the medical witnesses for appellant Secretary would recommend Massey for work inside a mine, and stated that he could be recommended for light outside work which would involve only slight exertion.

The foregoing evidence clearly shows that appellee was totally disabled from ever working again as a miner.

Was there substantial evidence that, following his complete disability as a miner, by reason of his physical impairment, he was able to engage in any substantial gainful activity?

Although Massey's family physician, who knew him better than any other, stated that, in his opinion, Massey was totally disabled from working at anything at which he could earn a living, and gave his reasons for his judgment; and Dr. Hambley testified that he could not do manual work, but only light work in conditions where there wasn't any demand on his time so that he would have to work under forced conditions, and that such things as barometric pressure made it impossible for him to be reliably employed, Dr. Warden, testifying for the employer in Massey's workmen's compensation claim said that, although Massey could not return to work in a mine, he could do light physical work outdoors and could be hired in light manual work, such as laying bricks or other "things that would not require strenuous effort," but that he could not be employed, for instance, in digging a ditch. Massey, of course, was not skilled as a brick mason; had no knowledge of the work of bricklaying; and there was no evidence that in the general area in which appellee lived, there were any job opportunities as a bricklayer. In addition, another witness of appellant Secretary, the vocational counselor, testified that because of Massey's silicosis, he could work at a job that required only sedentary and light physical capacity, and was removed from anything producing dust, such as "coal dust, stone dust, etc." It is to be remarked that bricklaying is not a sedentary occupation requiring only slight exertion; and if the available job must be one that is removed from all dust-producing materials, such as stone, it would seem that it would naturally include the handling of the much softer, and more dust-producing

1. *Pneumoconiosis*, according to appellant Secretary is: "A chronic fibrous reaction in the lungs to the inhalation of dust. It is attended by fibroid induration and pigmentation."

2. *Silicosis*, according to appellant Secretary is defined as: "Pneumoconiosis due to the inhalation of the dust of stone, sand, or flint containing silicon dioxide; grinders' disease."

material of brick. Moreover, common observation indicates that the work of a brick mason is hardly to be characterized as light work that involves only slight exertion. Furthermore, Dr. Warden was concerned only with pulmonary capacity to do light work. Neither Dr. Warden nor anyone else relied upon by the Secretary in denying Massey's claim for disability benefits, contradicts or, in any way, questions the finding of the other physicians that, in addition to Massey's pulmonary incapacity, he was also suffering from emphysema, as well as from dyspnea, angina on slight exertion, tachycardia, and hypertension.

From the foregoing, we are of the opinion that Massey has established that he has physical impairments of such a character as to preclude him from engaging in any substantial gainful activity, and that there is no substantial evidence to support the finding of the Hearing Examiner, upon which the Secretary relies, that Massey is not so disabled as to be entitled to disability benefits.

Appellant Secretary, in order to prove that Massey had many job opportunities adapted to his work capacity, produced as a witness Dr. Charles S. Runyan. Dr. Runyan was not a medical doctor, but a professor of education at Marshall University, Huntington, West Virginia. As appellant says in his brief, Dr. Runyan "conducted a thorough vocational study, taking into account all of the medical evidence before the Social Security Administration, including the evidence given at the current hearing. On the basis of this study, and his interrogation of the claimant at the hearing," the answers to which were freely stipulated by Massey's counsel, Dr. Runyan testified what Massey's residual capacities were. In his testimony, Dr. Runyan repeated what the medical evidence consisted of, omitting, however, Dr. Pergrem's uncontradicted testimony that Massey was suffering not only from pulmonary incapacity, but from emphysema, dyspnea, angina on slight exertion, and hypertension. However, Dr. Runyan mentioned that the General Compensation Adjuster of the Blue Diamond Coal Company had stated that "according to all medical evidence introduced in [Massey's] occupational disease [claim], he is suffering from the disease of silicosis and should not be exposed to dust inside a mine. He was awarded a 70% permanent partial disability to the body as a whole as a result of the occupational disease."

Dr. Runyan testified that he had "tried to ascertain some trades and characteristics that Mr. Massey had * * * and I've listed about ten that I think I can put my finger on by observation of Mr. Massey and by the testimony in the records." Dr. Runyan then recited that when Massey became disabled, he "had the agility sufficient to move about freely at the time he was injured. He had the ability to move about freely in the mines because you had to move around and move back for safety. He had the ability to crawl in cramped quarters. He had the dexterity of both hands and feet. He had ability to understand simple directions. He had ability to figure out the best means of setting a pattern for drilling holes for best cleavage or getting the right lumps—the right size of coal. He had ability to perform rapidly repetitive tasks. He was physically strong at the time. He had acceptable visual acuity. He had acceptable hearing acuity and lastly, he was motivated to the extent that he pursued a gainful occupation." Dr. Runyan then testified that in the light of the data before him, although Massey was suffering from silicosis, had limited vision, limited hearing, difficulty in breathing upon doing physical activity —strenuous physical activity, limited in walking any great distance, "there are a number of residual capacities that are possessed by the claimant that could be considered in future employment. He has ability to understand simple directions. He has dexterity of both hands and both arms, has ability to crawl in cramped quarters. He has acceptable visual acuity, that is, upon correction; ability to handle objects effectively; ability to coordinate immediate perceptions and bodily movements rather satisfac-

torily; and still has the ability to perform repetitive tasks."

In commenting upon the foregoing, it is to be said that there is no evidence that Massey has dexterity of both hands and both arms, and the ability to crawl in cramped quarters in his present physical condition. The other residual capacities mentioned seem inapplicable and irrelevant to any of the job opportunities subsequently enumerated by Dr. Runyan. He testified: "From the capacities [Massey] has I have listed a few job possibilities. Number 1—gateman, that is a property and equipment watcher * * *; bottle inspector; tool cleaner; machine cleaner; flagman; farm laborer; truck farmer, and it is indicated that he has done some truck farming, farming on a small scale, gardening and such. * * * The job should be one that requires only sedentary and light physical capacity. The job should be one that is removed from the dust, lint, coal dust, stone dust, etc. * * * It is my opinion that the claimant could be trained for an occupation utilizing claimant's residual capacities, but from some programs that we had in retraining coal miners, we have found it has been quite difficult for a trainee to leave his immediate area and go where employment exists. A man 54 years of age is rather reluctant to leave his natural habitat." As to the type of work that claimant might be able to perform—sedentary work removed from dust, and so on, Dr. Runyan stated that "there are jobs in any type of heavy equipment work * * * and they're doing a lot of construction in our part of the country around Huntington and I presume doing it as well in the construction of roads here in this part of the country. I don't know how—it looks like pretty good roads coming down here. Now as to a truck farmer, I would—we might add on there also a tobacco farmer also, too, that might fit in there very well."

Upon being questioned by the Hearing Examiner as to whether he knew of instances of people who had impairments such as claimant has, who had performed "such work as flagman or watchman or tool cleaner or anything of that kind," Dr. Runyan stated he did not have any knowledge of such instances in the last immediate year or two. When asked whether he knew of any industries that require special tool cleaners, tool machine cleaners in the bituminous coal fields of southeastern Kentucky, West Virginia, and Virginia, Dr. Runyan stated that he was not familiar with any such industries. On cross-examination by Massey's attorney, Dr. Runyan was asked whether he would "recommend this man with just one eye and with his lung condition to a prospective employer for a job as a night watchman or a flagman on a road project, in view of his visual problems and employment problems,"—and counsel added to his question: "If you were called upon as an expert by a prospective employer to interview this gentleman and such an interview revealed that you obtained the knowledge that you have here today and were then to make recommendation to this prospective employer as to whether or not it would be feasible, economically feasible, to hire this man as an eye-by-night watchman or flagman on the road, what would your recommendation be?" Dr. Runyan's reply to this question was: "Well, I'd look at it this way, as I understand it, I'm to point out the residual factors that he has that can be useful, as to whether they take him or not, that will be up to the employer, * * *." Counsel for Mr. Massey, not receiving a direct answer to his question, pursued the subject by asking:

"Counsel: Can I assume from that answer that you would recommend to a prospective employer that [he] would let the man be employed either as a night watchman or a flagman?

"Witness: That isn't in the realm of my duty here today, as I understand what I'm supposed to do is to point out things that he can do at the present time that are required in different types of occupations and I would indicate that he does have a vision comparable to what he had be-

fore his injury and he was able to be employed in the mines with its heavy equipment, it's reasonable to assume that he would be—well, let's put it this way, that his vision would not be—would not preclude him from being employed."

Obviously, Dr. Runyan would not have recommended a man like Massey, blind in one eye, and with defective vision in the other, as a night watchman or a flagman; but he had listed the job of night watchman and flagman as a job within Massey's capability, and he refused to give a candid answer to counsel's question, when it appeared that such a job for a man in Massey's condition would be absurd.

Further cross-examining Dr. Runyan, Massey's attorney continued:

"Counsel: Do you know of any such jobs in the bituminous coal fields in the Tri-state area, such jobs as a gateman, night watchman, or flagman?

"Witness: No, I have no access to knowledge of that.

"Counsel: Now, doctor, getting back to farming, it's in the record that the man did tend a small garden plot. Would you—do you know what our hillside farms are, gardens up here in the hills?

"Witness: Well, I've seen some pretty good ones in some areas. I don't know, of course, a lot of it depends upon, I guess, ability to play with it and work with it and get the most out of it. In some of the valleys I've seen some pretty good ones.

"Counsel: You do know, do you not, doctor, that this is not a truck gardening center and to get into it he would either have to own a farm or work for someone that specialized in truck farming.

"Witness: That's right. It might necessitate moving from this area or something to that effect.

"Counsel: That's all."

Claimant submitted that, assuming he could perform some of the work mentioned as within Dr. Runyan's list of job capabilities for him (which he could not actually perform), there were no such existing job opportunities in the general area in which he lived.[3] To this claim, the Secretary responds by saying that it does not matter whether or not such job opportunities exist within the general area where claimant lives. The District Court, in reversing the decision of the Secretary, stated that, while the record established that claimant could perform certain jobs,[4] it was also necessary to find that "the opportunities available to a person who can do only what the claimant can do * * * refers to the general area in which the plaintiff lives." Since the record could not support such a finding, the District Court concluded that there was not substantial evidence to uphold the decision of the Secretary.

Appellant, in his original brief, filed in this court, insisted that the holding of the District Court, that the job opportunities must exist in the general area in which claimant lives was erroneous, and that the reliance of the District Court on the authority of Butler v. Flemming, 288 F.2d 591 (C.A.5), was entirely misplaced.

Appellant further states in his original brief that "the instant case squarely presents the question to the Court for the first time." This question, according to appellant, is whether the Secretary must show only that a claimant has capabilities to engage in certain specific types of work, or whether he must also show that such types of work are available in the general area in which the claimant lives.

3. The only work Massey performed was taking care of a little patch of garden "about the size of this room" and another patch about 100 yards distant.

4. It is also to be emphasized that Dr. Runyan testified that any job in which

Massey might be employed "should be one that requires only sedentary and light, physical capacity," thereby ruling out all of the jobs suggested by him, as an expert, none of which was sedentary.

In Butler v. Flemming, supra, the Court of Appeals for the Fifth Circuit, speaking through Judge Brown, stated that the record in that case failed to disclose that there was "any indication of any specific work less exacting within [claimant's] residual competency and reasonably available as a prospective source of employment *in the general area where he lives*," and that this was the test as to whether there was any work available which the claimant was able to perform. (p. 595) (Emphasis supplied.)

In his reply brief, the Secretary at first seems to have abandoned his prior argument, and, in reliance upon Celebrezze v. Kelly, 5 Cir., 331 F.2d 981, 982, emphasizes the language in that opinion in which the court said that, in determining whether there was any work which claimant would normally be expected to perform, the administrator must "consider the matter of reasonable availability of jobs within the geographical areas which the claimant would normally be expected to consider if regularly in the labor market." It would appear to us that this brings appellant in agreement with Judge Swinford's opinion in this case in the District Court.

However, basing his argument on Celebrezze v. Kelly, supra, the Secretary further reasons, in a way which is not clear to us, that "as long as there are generally available throughout the United States specific types of jobs which are within the claimant's determined capabilities, and as long as his physical condition does not preclude his competing for those jobs, it follows that he is not disabled for social security purposes." Celebrezze v. Kelly, supra, makes no mention of, or suggests no implication of "jobs which exist generally in the United States," or jobs that "are generally available through the United States," as a factor that disqualifies a claimant from disability benefits under the Social Security Act. We disagree with the Secretary's contention that a claimant is not disabled for social security purposes as long as he can find some kind of job which exists generally in the United States. See, post, Butler

v. Flemming, 288 F.2d 591 (C.A. 5); Cyrus v. Celebrezze, 341 F.2d 192 (C.A. 4). It is our conclusion that in the instant case, Judge Swinford, in the District Court, properly stated the law when he held that job "opportunities available to a person who can do only what the claimant can do and this refers to the general area in which the plaintiff lives."

It is impossible to attach importance to Dr. Runyan's testimony, for it constituted no substantial evidence that Massey was able to engage in substantial gainful activity, either as flagman, with one blind eye and defective vision in the other, for whom there were no jobs in the general area, or as a tool cleaner, gateman, night watchman, farm laborer, or truck farmer, for whom there were no jobs in the general area.

It is largely upon Dr. Runyan's testimony that the Secretary relies in denying disability benefits to Massey. Dr. Runyan, after studying the exhibits and listening to the testimony, relied upon the "U. S. Dictionary of Occupational Titles," in arriving at his conclusions as to what work Massey could perform. Dr. Runyan testified: "Now, I have taken from the occupational files and D.O.T. (Dictionary of Occupational Titles) and I note this morning that this claimant indicated * * * that at one time he had experience as a loader—a hand-loader. Now, as a hand-loader of coal, it carries a Dictionary of Occupational Titles Code Number of 9–22120, and I would just indicate what the 9 indicates. The 9 indicates it is a non-skilled occupation." The witness then continued his discussion, finally arriving at the conclusion that Massey had capabilities for certain job possibilities, according to the U. S. Dictionary of Occupational Titles, including gateman, watchman, bottle-inspector, tool-cleaner, machinery cleaner, flagman, farm laborer, and truck farmer. As to tool and machinery cleaner, he implied that there were such jobs in any type of heavy equipment work, but he appeared to have no knowledge that there were

such jobs in the area. Furthermore, he did not know of any industries in Kentucky, West Virginia, or Virginia, that required tool-cleaners, or whether there were any available jobs, such as gateman or flagman in the three states above mentioned, and as to the job of a farm laborer, or a truck farmer, he said "it might necessitate moving from this area."

The instant case is similar to Cyrus v. Celebrezze, 341 F.2d 192 (C.A.4) decided January 5, 1965, in which it appeared that the physicians who were intimately familiar with the claimant's medical condition, concluded that he was totally and permanently disabled and impossible to rehabilitate; that, on the other hand, there were assertions of two physicians, hired by the Social Security Administration to evaluate claimant's condition, and that they expressed the view that claimant would be able to work if he could arrange to sit for two four-hour shifts. One of these physicians was most guarded in his answer, stating that he saw no *neurological* reason disqualifying the claimant from such an undertaking; but both of the Administration's physicians frankly admitted "that because they had no prior knowledge of Cyrus' history and only a limited time in which to examine him, their evaluations might not be entirely accurate." The court, in arriving at a determination of the case, said:

> "The medical evidence that Cyrus suffers from a disability is uncontradicted. The only conflict is as to the extent of his residual capacity. Normally, it is for the Secretary and not the courts to resolve conflicts in the evidence. Snyder v. Ribicoff, 307 F.2d 518, 520 (4th Cir. 1962). But where the Secretary places reliance upon one portion of the testimony to the disregard of overwhelming evidence to the contrary, the Secretary's conclusions may not stand. Thomas v. Celebrezze, supra [4 Cir., 331 F.2d 541]."

The court held that, considering the nature of the Administration doctors' testimony, "we think it was not of such substantial nature as to negate the overwhelming evidence establishing the claimant's disability."

The similarity of the instant case to Cyrus v. Celebrezze, supra, is especially marked, since in Cyrus the court said that the Secretary's conclusion rested entirely "on the vocational counselor's reliance on capsule job descriptions appearing in the 'U. S. Dictionary of Occupational Titles,' and 'Estimates of Worker Trait Requirements.' The record is barren of evidence to show that he actually checked to determine whether the jobs cited were available *in the vicinity of Cyrus' home.*" (Emphasis supplied.)

In the listing of available jobs, testified to by Dr. Runyan in the instant case, we find a marked similarity to those set forth in the testimony of Dr. Thomas, the vocational counselor in the Cyrus case. These available jobs listed in the Cyrus case included "gatemen" and "guards,"— corresponding to gatemen and night watchmen listed by Dr. Runyan. Since, in the Cyrus case, there was a shoe manufacturing company in the vicinity in which applicant lived, the vocational counselor in that case also listed as available employment opportunities in the shoe industry, the job of "stitch marker" and "shoe doper."

In speaking for the court in Cyrus v. Celebrezze, supra, Judge Sobeloff said:

> "Although [Dr. Thomas, the vocational counselor] testified that jobs in the shoe industry as 'Fancy Stitch Marker, Hand' and 'White Shoe Doper' were available locally, there is no evidence that he actually checked with the Craddock-Terry Shoe Corporation, which he knew to be the only area shoe manufacturer, to see if they employed any people for these jobs, to say nothing of the more pertinent issue which is the employability of this claimant with his restricted capacity. On this point the Secretary's witness conceded on cross-examination that employers, concerned about their insurance programs and safety records, are reluctant to hire persons in Mr. Cyrus' condition.

"The conclusion that the job of kennel 'Keeper' was available was reached speculatively by determining that four kennels were listed in the telephone directory. The inquiry went no further.

"Dr. Thomas inferred from the existence of several large industrial plants that jobs as guards and gatemen were available in the local economy.

"The fanciful nature of Dr. Thomas' testimony is perhaps best revealed by his own comment that 'there are thousands of jobs here [in the 'U.S. Dictionary of Occupational Titles'], some of them sound funny.' Indeed, some of those suggested, particularly the job as kennel 'Keeper,' requiring physical activity in handling the animals, do 'sound funny' when Cyrus' background and physical limitations are taken into account.

"The 'U.S. Dictionary of Occupational Titles' and other similar materials may have a proper function. But exclusive reliance on these books is not enough. * * * The existence of jobs in a compilation running the full gamut from astronaut to zookeeper, available somewhere in the national economy, from Anchorage, Alaska, to Zapata, Texas, is of little relevance. Since the abstract 'average' man is not the standard to be used, Pearman v. Ribicoff, 307 F.2d 573 (4th Cir. 1962), there must be evidence to show the reasonable availability of jobs which this particular claimant is capable of performing.

　　*　　*　　*　　*　　*　　*

"The proof of Cyrus' disability is strong, and the evidence to the contrary is lacking in substance."

We have been referred, in briefs in prior cases, and in the opinion of the Hearing Examiner in this case, to the 1958 Hearings before the Ways and Means Committee of the House of Representatives on the 1956 Amendments to the Social Security Act, and have had repeatedly quoted to us, with special emphasis on the question of disability benefits, the following:

"During the the 1958 hearings of the Committee, Chairman Wilbur D. Mills stated: 'Mr. Secretary, you will recall that when we enacted this (disability) program we very deliberately tried to write into law a very strict and conservative definition to guide your Department in the administration of the program in making these payments.' Hearings Before the Committee on Ways and Means on all Titles of the Social Security Act, June 16–30, 1958, 85th Cong., 2d Sess., p. 36."

We find nothing in the foregoing to inhibit a Hearing Examiner, an Appeals Council, the Secretary, or the courts, from awarding disability benefits in this case in the same way as in the other cases heretofore decided by this court; and the foregoing, in our view, is in agreement with the notable opinion of Butler v. Flemming, 288 F.2d 591, 595 (C.A.5), in which Judge Brown, speaking for the court, said:

"If, as suggested in the Government's brief, Hallard v. Fleming, D. C.W.D.Ark.1958, 167 F.Supp. 205, and Judge Learned Hand's statements in Theberge v. United States, 2 Cir., 1937, 87 F.2d 697, 698, concerning a different statute enacted for a different policy in a different era, are to stand for the proposition that pain, no matter how severe, is not disabling unless work does 'more than hurt' so that it 'substantially aggravate[s] his malady,' 87 F.2d at page 698, we regard them as contrary to the standard announced in Booker and Kerner and many others like them. Perhaps it is true that history teaches that 'A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities * * *.' But the purpose of much social security legislation is to ameliorate some of these rigors

that life imposes. Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he shall be deemed to be disabled for the purposes of this Act."

The argument, too, is addressed to us that the applicant for disability benefits in this case is a comparatively young man, and that he could perform, at least, light work of a substantial gainful nature, if he wanted to. This argument implies that in this case, and in many other like cases, applicants for disability benefits who are able to work belong to the class that does not want to work, or refuses to work.

Some people have always blamed the poor for being poor, and the unemployed for being unemployed, as is especially remembered from the early days of the Works Progress Administration more than thirty years ago. However, in the intervening years, much investigative work has been carried on by federal, state, county, and city governments, and by civic, philanthropic, and labor organizations, as well as in studies and findings of government legislative committees, the Department of Labor, and other groups, directed to the study of unemployment, its causes, and remedies. Now, it is generally accepted that, of those able to perform labor and accept employment, only a small fraction of unemployed persons, perhaps 2% at most, refuse to work and prefer a small relief payment to wages; and, even in such cases, while a laziness may appear to be the outward sign, nevertheless, behind this is found a psychopathic condition, a deep character defect, emotional instability, or, at times, mental illness. Anyone who has read the literature on the subject during the past thirty years knows this. While we are not here concerned with determining the exact percentage of unemployed who refuse work or ask a small dole in preference to employment, we allude to the foregoing in

emphasizing that it is a matter of common knowledge that the overwhelming number of men who became unemployed, seek re-employment, or a new employment, rather than government relief.

In the instant case, applicant, at the time he filed for disability benefits, as has been stated, was fifty-two years old; he had started working in the coal mines when he was sixteen years old; and he worked for thirty-five years until his disability. At that time, his annual earnings were $6,619.60.

There is an unconscious implication in the government's argument that this particular applicant, who worked in the coal mines all his life and was then disabled for further work as a miner, would prefer to do nothing and receive, in disability benefits, a fraction of what he could earn in substantial gainful employment. With such a work record behind applicant, and such an earning power, it is impossible to classify applicant in that minuscule number of the unemployed who refuse to do any work available to them, even if it results in substantial gainful employment.

From all that has been said, it is obvious that, in proving that an applicant is not precluded from performing substantial gainful employment, it is not enough to rely upon testimony that a claimant can do "light work." What that light work consists of must be specified. Furthermore, the evidence of some physicians who testify as to a partial disability based upon one disabling factor is not to be taken as substantial evidence controverting the undisputed testimony of other physicians who testify as to a greater disability based on a larger number of disabling factors. So, where a physician testified that, because of a certain slightly diminished pulmonary capacity, a man is not disabled from doing certain work, this is not substantial evidence that the man is disabled only to a slight degree, when compared with uncontroverted medical evidence that the man is totally disabled because of emphysema, hypertension, tachycardia, osteoarthritis, and other ailments. In addition, proof of avail-

able job opportunities must be supported by evidence that such job opportunities are available in the general area in which the applicant lives.

In conclusion, it is our opinion that Massey, at the time of filing his claim for benefits, was disabled from work as a miner, and, further, that as a result of his disability, he was precluded from performing any substantial gainful employment—and evidence to the contrary is lacking in substance. Moreover, there was no proof that any job, reasonably available, which Massey was capable of performing, existed within the general area in which he lived. Butler v. Flemming, 288 F.2d 591 (C.A.5); Hall v. Celebrezze, 314 F.2d 686 (C.A.6); Cyrus v. Celebrezze, 341 F.2d 192 (C.A.4).

In accordance with the foregoing, the judgment of the District Court is affirmed upon the opinion of Judge Swinford, and with the direction that appellee be found to be entitled to the payment of disability benefits in accordance with his application.