**Wilbur A. HEINEMANN, Jr., Plaintiff,**

v.

**GENERAL MOTORS CORPORATION,
Defendant.**

**No. 70 C 3023.**

United States District Court,
N. D. Illinois, E. D.

Feb. 28, 1972.

On Motion for Amendment of
Judgment May 3, 1972.

George Bullwinkel, Chicago, Ill., for
plaintiff.

E. Manning Giles, Chicago, Ill., for
defendant.

### MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on plaintiff's and
defendant's cross-motions for summary
judgment pursuant to Rule 56 of the
Federal Rules of Civil Procedure.

Plaintiff, Wilbur A. Heinemann, Jr.
(hereinafter referred to as "Heine-
mann"), is a resident of Indiana. De-
fendant, General Motors Corporation
(hereinafter referred to as "GM"), is a
Delaware corporation licensed to do busi-

ness in the State of Illinois. The amount in controversy exceeds $10,000, exclusive of interests and costs, and this Court is alleged to have jurisdiction to hear this case under diversity of citizenship and various federal statutes dealing with trade marks and unfair competition. The material facts in this case are not in dispute and, accordingly, the matter is appropriate for disposition by summary judgment.

Ever since he was quite young the Plaintiff has been interested in automobiles. Upon obtaining his first car at the age of 18, Heinemann began "modifying" it as soon as he could. Plaintiff's interest led him to purchase a succession of automobiles, many of which he "modified" or changed radically. In 1961, Heinemann extensively modified a 1951 Ford convertible which he named "SAINTNIC'S SLAY" and exhibited in several automobile shows. In 1964, the Plaintiff modified a 1958 Chevrolet which he named "BRAND X" and entered in drag races. Later in 1964, Plaintiff acquired an interest in a 1932 Model A Ford, the automobile involved in the instant suit. Upon acquisition of this interest, Heinemann began extensive modification of this automobile in his spare time.

In February of 1968, Plaintiff, with his brother and a friend, narrowed down the number of possible names for this heretofore unnamed automobile to four —"The Machine", "The Judge", "The Boss" and "Shotgun". After a discussion, the name "The Judge", was selected. The origin of this name and Heinemann's reason for selecting it are clearly shown by this colloquy during the Plaintiff's deposition:

Q [Mr. Ballard] When did the possibility of naming it The Judge first occur to you, if you recall?

A [Heinemann] When the television show Laugh-In came on the air

and became the great topic of conversation. It became so popular.[1]

On June 15, 1968, Plaintiff had the words "The Judge" painted on the side of his automobile by an advertising company.

On July 2, 1968, Plaintiff displayed his automobile in the showroom of a Milwaukee, Wisconsin, Chevrolet dealer; Plaintiff received no money for displaying the automobile but did receive free radio advertising and free entry to the July 4, 1968, week-end racing at Union Grove, Wisconsin. In the next two or three months, Plaintiff exhibited or raced his car at several events in the Milwaukee area. These included the "Summerfest" event in July, the "Youth on Wheels" exhibit in August, and the Great Lakes Dragway event in September. Heinemann was not paid for participating in any of these events although he did receive a mileage allowance of $27.50 in October for having brought his car to the "Youth on Wheels" exhibit.

During the spring of 1968, officials of GM's Pontiac Motor Division (hereinafter referred to as "Pontiac") decided to produce a new, high performance model of its Tempest GTO line. John Z. DeLorean, Vice President of GM and General Manager of Pontiac from July, 1965, to February, 1969, stated on affidavit that he had decided to name this new model "The Judge" on July 19, 1968, subject to clearance from Defendant's General Counsel's office that the name was available for Pontiac's use. Mr. DeLorean stated:

That the Rowan and Martin TV Show "Laugh In" is one of his favorite TV programs, which he has watched at every opportunity and that from the time he first heard the expression "Here Comes de Judge" on the TV Show "Laugh-In", in the fall of 1967, he thought that the name

1. Plaintiff's reference to the television show "Laugh In" is, in fact, a reference to a particular skit on the show which lampooned a judge and judicial decorum in general. The phrase "Here come de Judge", repeated rhythmically, was an important part of this skit and it ultimately became a very popular slogan, especially among young people.

"THE JUDGE" would be a good name for an automobile.

That he selected the name "THE JUDGE" because of the popularity of the expression "Here Comes de Judge" on the Rowan and Martin TV Show "Laugh In".

That he never heard of plaintiff, Wilbur A. Heinemann, or his rebuilt 1932 Ford called THE JUDGE until September 29, 1971, when Mr. Mosher of General Motors Legal Staff advised him of the [instant] suit.

On July 30, 1968, an officer of Pontiac asked George R. Mosher, a member of GM's General Counsel, to advise Pontiac on the availability of the words "Judge" and "TJ" for use with automobiles. After a thorough search disclosed no prior use of the words "Judge" or "TJ" for automobiles, GM's General Counsel sent a letter of opinion dated August 6, 1968, to Pontiac indicating that such names were available.

The first public showing of Pontiac's "The Judge" was on September 26, 1968; that same day Heinemann learned of Pontiac's new automobile when he went to a local Pontiac dealer to see the new 1969 line of automobiles. Prior to that date, Heinemann had no knowledge whatsoever that GM was going to produce an automobile with the same name as his own. Shortly after learning of Pontiac's new automobile, Plaintiff went to be a law firm and, on October 1, 1968, made application for registration of the trade mark "The Judge" with the State of Wisconsin. On October 3, 1968, the following trade mark was registered with the State of Wisconsin in Heinemann's name:

### "THE JUDGE"

consisting of the words, "The Judge", in any form, size, color, style of lettering; as pertains to entertainment and advertising.

On February 19, 1969, Plaintiff filed an application for registration for the service mark "The Judge" with the United States Patent Office. On July 28, 1970, the following service mark was registered in the Plaintiff's name:

### THE JUDGE

For: Entertainment Services—Namely, Exhibition Automobile Racing—In Class 107 (Int.Cl. 41).

In his application for the United States Service Mark, Heinemann claimed first use of "The Judge" in interstate commerce as of October 13, 1968. Later, he back-dated his claim of interstate use to July 2, 1968.

Heinemann finally notified GM of his claim to certain rights in the mark "The Judge" on February 17, 1969. After unsuccessful settlement negotiations, the instant suit was filed on December 2, 1970.

The complaint is set out in five Counts. Count I alleges infringement of the federally registered trade mark, Count II alleges infringement of the Wisconsin state registered trade mark, Count III alleges infringement of a common-law trade mark right, Count IV alleges unfair competition in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and Count V alleges common-law unfair competition and interference with a valuable business relationship. The complaint does not seek an injunction or any other equitable relief but instead demands that Defendant reimburse Plaintiff in the amount of $55,000 for the time and expense involved in creating goodwill for the trade mark "The Judge". Plaintiff also requests that this Court triple the amount of damages demanded pursuant to section 35 of the Lanham Act, 15 U.S.C. § 1117.

Defendant contends there are four separate reasons why Plaintiff is not entitled to the relief demanded: (1) The Plaintiff had no trade mark or service mark rights in the Slogan "The Judge" at any time relevant to this suit, (2) the Defendant has not infringed or diluted any purported trade mark or service mark rights of Plaintiff and has committed no acts of unfair competition,

(3) the acts of Defendant which Plaintiff complains of have not been the cause of any legally compensable damage to Plaintiff, and (4) Plaintiff, by his own conduct, has waived, forfeited or otherwise lost any right to recover for the wrongs alleged.

■ This Court will not discuss all of the issues raised by Defendant's motion for summary judgment; instead, this opinion will be limited to the sole issue of whether or not the Plaintiff had any trade or service mark rights in the slogan "The Judge" at any time relevant to the instant suit. This Court is of the opinion that if Plaintiff is unable to demonstrate that he had any trade or service mark rights in the slogan, the entire complaint must fall.

It has long been held that trade or service mark rights are acquired by appropriation and use, not by registration, Tillamook County Creamery Ass'n v. Tillamook Cheese and Dairy Ass'n, 345 F. 2d 153, 160 (9th Cir.), cert. den., 382 U.S. 903 (1965); 4 Callmann, Unfair Competition and Trademarks (2nd) 2066 (1950). Accordingly, if Plaintiff is not entitled to common-law protection of his alleged trade or service mark, his registrations with the State of Wisconsin and the United States Patent Office will be of no import in this case. The issue presented to this Court, therefore, is whether or not Plaintiff had acquired common-law rights in the slogan "The Judge" prior to the time Defendant began using the slogan in the advertising of its new automobile.

■ It is well settled that there is no such thing as a common-law property right in a trade or service mark except as a right appurtenant to an established trade or business with which the mark is employed, United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97 (1918); Duff v. Kansas City Star Co., 299 F.2d 320, 324 (8th Cir. 1962). In the *Rectanus* case, *supra,* the Supreme Court stated:

The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; *and it is not the subject of property except in connection with an existing business,* 248 U.S. at 97. [Emphasis supplied.]

Accordingly, Plaintiff must demonstrate that the slogan "The Judge" was used in connection with a trade or business at the time of the alleged infringing activity if he is to be successful in the instant suit.

Plaintiff's deposition discloses that it was his intention, when he first used the slogan on his automobile, to open an automobile equipment shop which would capitalize upon the good will generated by the slogan. In fact, Heinemann did open such a shop in June of 1969, approximately six months after the Defendant began production and marketing of its version of "The Judge". However, because Plaintiff believed the slogan "The Judge" had been completely appropriated by GM due to its massive advertising campaign, Plaintiff named his shop "The King Speed Shop".

The only evidence that Plaintiff has been able to present to this Court, pursuant to the instant motions, which tends to show that he was in a trade or business which the slogan was appurtenant to prior to the opening of his shop is Plaintiff's assertion that some of the expenses of maintaining and displaying his automobile had been deducted as a business expense on Plaintiff's 1968 income tax return. Plaintiff has refused, however, to present his 1968 income tax return to this Court as an exhibit to his motion. This evidence, therefore, is entitled to very little weight and certainly does not conclusively prove that such a trade or business was, in fact, in existence.

■ Other than the reference to the income tax deduction, Plaintiff's asser-

tion that he was in a trade or business at the time that GM began trademark usage of the slogan is based upon Plaintiff's statements that it was his intention to open an automobile equipment shop which would have capitalized upon the slogan "The Judge". This Court is of the opinion that these statements are not a sufficient basis for a finding of the existence of the necessary trade or business. While the law does not require a nationwide business; an old, established business; or even a profitable business for the acquisition of property interests in trade or service marks, it does require a *presently existing* trade or business for such acquisition. The exhibits disclose that Plaintiff had only a desire to open a business *in futuro*. This is not sufficient to create a property interest in trade or service marks. To hold otherwise would make a trade mark a property right in gross, instead of a right appurtenant, and would contradict the basic tenets of trade mark law, United Drug Co. v. Theodore Rectanus Co., *supra*.

On the surface, the Plaintiff did nothing different with his version of "The Judge" than he did with any of his other automobiles including "SAINTNIC'S SLAY" and "BRAND X". Both of these automobiles were exhibited and one was raced. Plaintiff won a $25 bond at an exposition with "SAINTNIC'S SLAY" and $7 at a drag race with "BRAND X". Yet, on deposition, Plaintiff characterized his work on these automobiles as a sport or hobby not carried out primarily for the production of income.

Among people who modify automobiles for exhibition or racing, there appears to be a tendency to name cars after currently popular slogans or words. Thus, on deposition, Heinemann admitted that he named his 1958 Chevrolet "Brand X" because "[t]hat [slogan] was in vogue at that time with commercials." Also, Heinemann admitted that he had originally intended to name his 1932 Ford "U.F.O." because "[t]hey [U.F.O.'s] came into prominence again in Michigan . . . ." However, before Plaintiff could name his automobile "U. F.O.", someone else had given that name to his racing vehicle.

In the instant case, both Plaintiff and Defendant "borrowed" the slogan which had already obtained considerable recognition and good will due to the efforts, not of the parties, but of a television show. Both parties felt that the slogan would be a good name for a high performance automobile. The difference between the parties, however, is that the Defendant is engaged in the business of producing automobiles while Plaintiff, at all times relevant to this suit, was simply racing or displaying his automobile as part of a hobby. Plaintiff admits as much as evidenced by this colloquy during his deposition:

> Q [Mr. Ballard] Is it correct that at that time [the time of the application for the Wisconsin registration] the only business you were in was working for Sinclair Oil Company?
>
> A [Heinemann] Yes.

Heinemann, by selecting a very popular slogan, ran the risk that another person or firm would appropriate the slogan prior to the time that Plaintiff could establish his automobile equipment shop. Thus, what Plaintiff attempted to do was reserve a trade or service mark pending the creation of a trade or business; this the law will not allow him to do.

### On Motion for Amendment of Judgment

This cause comes on plaintiff's motion for amendment of judgment pursuant to Rule 59(e) and for relief from judgment pursuant to Rule 60(b) (6) of the Federal Rules of Civil Procedure. For the purposes of this opinion and order, the instant motion will be treated as a motion for reconsideration.

On February 28, 1972, this Court entered a memorandum opinion and order (1) granting defendant's motion for summary judgment and (2) denying plaintiff's motion for summary judgment. By the instant motion, plaintiff

urges that this Court amend the judgment entered on that date for the following reasons:

(1) There exists an issue of material fact as to whether or not plaintiff has trademark rights in the slogan "The Judge";

(2) The opinion places plaintiff in the position of infringing defendant's trademark even though plaintiff used the mark first;

(3) Count V of the complaint was erroneously dismissed since it relates to unfair competition, not trademark rights; and

(4) Plaintiff has not "refused" to present his income tax forms as exhibits to the previously filed motions.

Each of these reasons will be discussed separately.

## I. THE ALLEGED ISSUE OF MATERIAL FACT

In his reply memorandum, plaintiff states:

Plaintiff never claimed that he was in the retail auto parts business until after GM adopted its mark by selling Pontiac THE JUDGE vehicles. What Plaintiff *does* claim is that he was in the business of preparing, exhibiting and racing competition vehicles, for himself and for others.

This statement is totally inconsistent with the proofs supplied by both parties pursuant to the previous motions. The proofs clearly demonstrated that all of plaintiff's activities in connection with the slogan was for the purpose of publicizing an automotive parts store which was to be opened at some time in the future. Plaintiff admits as much in his reply memorandum when he states:

. . . it is undisputed that Plaintiff received compensation in the form of prize money, free entry to events, reimbursement for expenses, and (most importantly) free radio publicity and display privileges at major automotive shows. At a time prior to

GM's announcement of its own intention to use the same mark, this was valid compensation for services rendered and *was done pursuant to an overall business plan and purpose in connection with Plaintiff's retail automotive parts store which in fact opened the following summer.* [Emphasis supplied.]

Plaintiff's claim of trademark rights in the slogan "The Judge" is obviously based upon his use of the mark to publicize and build good will for a business operation not yet in existence. This is simply not enough to give plaintiff protectible rights in the slogan, United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918). As for prize money received for racing "The Judge", this Court has already noted in its previous opinion that plaintiff characterized his activity with other automobiles as a hobby even though he won prize money with these other cars. The amount of compensation received for racing "The Judge" is so minimal that this Court is convinced that, as a matter of law, plaintiff was not engaged in the business of racing. Accordingly, this Court holds that there is no issue of material fact in this case.

## II. THE ALLEGED DESTRUCTION OF PLAINTIFF'S RIGHTS

Plaintiff states:

The decision as presently written leaves plaintiff without any trademark rights whatever. His United States registration and Wisconsin state registration are extinguished although the opinion does not say so in express terms. This leaves GM with senior rights in the mark, and places plaintiff in the ironic position of infringing GM's trademark, *even though plaintiff used it first.* Is this what the Court intended? Is it just?

Quite simply, plaintiff has misread the Court's opinion. All this Court held was that plaintiff could not assert trademark rights against the defendant; it did not hold that defendant could assert trade-

mark rights against plaintiff. That issue simply was not before the Court. Accordingly, this Court holds that the judgment entered by its previous order should not be amended for the reason hereinabove set forth.

## III. THE COURT'S ALLEGED ERROR IN DISMISSING COUNT V

The theory behind Count V of the complaint, described by plaintiff as a "right to publicity", can best be shown by a hypothetical set forth by plaintiff:

> Does the Court intend to hold that an amateur golfer has no right of action against a manufacturer of sportswear for using his name or likeness on its products, simply because the golfer is not in a 'trade or business' as an amateur? That would seem to be the result as expressed by the present opinion.

The simple answer to plaintiff's hypothetical is that the Court made no such holding. Heinemann's name was not used by defendant and certainly his likeness was not used; indeed, the uncontroverted evidence shows that GM had no knowledge of the plaintiff's existence at the time it began trademark usage of the slogan. Heinemann admitted appropriating the slogan from a popular television program. To equate such an appropriated slogan with a person's real name or likeness would be to stretch the law beyond recognition. Accordingly, summary judgment was properly granted for defendant on Count V.

## IV. THE REFUSAL TO PRESENT TAX FORMS

Plaintiff objects to the Court's statement that plaintiff "refused . . . to present" tax forms. This Court will not delete that sentence. In the original motions for summary judgment, plaintiff referred to the income tax deductions and yet he failed to present copies of the tax returns; thus, it is clear that plaintiff "refused to present" the tax forms. The forms were provided with the instant motion, however, and having viewed them, this Court is of the opinion that they do not present evidence sufficient to base an amendment of the previous judgment entered.

Accordingly, it is hereby ordered that plaintiff's motion for amendment of judgment and for relief from judgment is denied.