PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/03/99
THOMAS K. KAHN
CLERK

_____

No. 98-4126

_____

D. C. Docket No. 97-8273-CV-JAL

CARNIVAL BRAND SEAFOOD COMPANY,

Plaintiff-Appellant,

versus

CARNIVAL BRANDS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 3, 1999)

Before ANDERSON, Chief Judge, MARCUS, Circuit Judge, and MILLS*, Senior
District Judge.

ANDERSON, Chief Judge:

_____

* Honorable Richard H. Mills, Senior U.S. District Judge for the Central District of
Illinois, sitting by designation.

Carnival Brand Seafood Company ("CBSC") brought this trademark infringement action against Carnival Brands, Inc. ("CBI"). The district court granted summary judgment for defendant CBI on the ground that CBSC had failed to raise a genuine issue of material fact with respect to the likelihood of confusion to the extent of the products as to which CBSC had priority. Plaintiff CBSC now appeals.

## I. FACTS

Beginning in 1980, Honduran company Mariscos de Bahia, S.A. de C.V. ("Mariscos") began using the brand name "CARNIVAL" in connection with the sale of fresh and frozen boxed raw shrimp. Mariscos sold shrimp to various wholesalers and retailers, including food suppliers and restaurants, through Miami distributor Ludwig Shrimp Co. Ltd. ("Ludwig"). CBSC incorporated as a Delaware corporation (with its headquarters in Florida) in March 1996, and Mariscos assigned to CBSC all of its rights in the CARNIVAL mark on October 1, 1996 ("Mariscos Assignment"). CBSC registered the CARNIVAL mark with the Patent & Trademark Office. CBSC then expanded its CARNIVAL product line to include not merely raw shrimp, but also pre-packaged entrees such as bacon-wrapped shrimp, shrimp scampi, grouper, red snapper, Caribbean snapper marinated in lemon pepper sauce, mahi mahi fillets,

2

yellow fin tuna, orange roughy, halibut, lobster tails, and "surf and turf" (lobster tails with beef tenderloin).

In addition to the Mariscos Assignment, CBSC also received an assignment of rights in the CARNIVAL mark from Hi-Seas of Dulac, Inc. ("Hi-Seas"), a Louisiana corporation, on April 17, 1997 ("Hi-Seas Assignment"). Hi-Seas had begun using the mark "CARNIVAL!" in June 1992 in connection with the sale of fresh frozen shrimp, cooked shrimp, breaded shrimp, cooked crawfish, and breaded alligator. Following the Mariscos Assignment, CBSC sued Hi-Seas for trademark infringement. As part of a settlement of that litigation, Hi-Seas executed the Hi-Seas Assignment.

Defendant CBI is a New Orleans, Louisiana company that is engaged in the business of selling prepared Creole or Cajun-type food products. CBI, either by itself or as a sole proprietorship prior to its incorporation,[1] has been engaged in this business since 1990. The original proprietorship sold only chicken gumbo and seafood gumbo, using the brand name "CARNIVAL" or "CARNIVAL CAJUN CLASSICS." In December 1992, CBI incorporated and expanded into other pre-cooked seafood products such as shrimp cakes, crawfish cakes, lobster cakes, and crab cakes. CBI now sells an array of pre-cooked, pre-packaged, ready-to-eat seafood products and

---

[1] For simplicity's sake, we use "CBI" herein to refer to CBI or the sole proprietorship that was its predecessor in interest.

3

sauces with a Cajun or Creole theme; these products are available in grocery stores for retail purchase. CBI has promoted its products through a web page on the Internet and on the home shopping network cable television station QVC.

Plaintiff CBSC filed the instant action against defendant CBI on April 18, 1997, alleging that by using the CARNIVAL mark, CBI infringed upon CBSC's trademark. The complaint brought one count of statutory trademark infringement under the Lanham Act, 15 U.S.C. § 1114, one count of false designation of origin and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), and one count of common law trademark infringement. Plaintiff later filed a motion for a preliminary injunction. The district court, finding no genuine issue of material fact as to the likelihood of confusion between the sources of plaintiff's and defendant's products, granted summary judgment for defendant CBI, and denied the motion for a preliminary injunction as moot.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo, with all facts and reasonable inferences therefrom reviewed in the light most favorable to the nonmoving party. Hale v. Tallapoosa County, 50 F.3d 1579, 1581 (11th Cir. 1995). Summary judgment was due to be granted only if the forecast of evidence before the

4

district court showed that there was no genuine issue as to any material fact and that the moving party, i.e., CBI, was entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## III.  ANALYSIS

To prevail on a trademark infringement claim, a plaintiff must show (1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion.  Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 122 F.3d 1379, 1382 (11th Cir. 1997) (citing  Dieter v. B & H Indus. of S.W. Fla., Inc., 880 F.2d 322, 326 (11th Cir.1989), cert. denied, 498 U.S. 950 (1990)).  Plaintiff CBSC itself did not begin to use the CARNIVAL mark until at least as late as 1996. Defendant CBI, on the other hand, used the CARNIVAL mark (or some variation thereof)[2] beginning in 1990.  Therefore, any priority that CBSC claims over CBI with respect to the CARNIVAL mark must have been derived from one of CBSC's predecessors in interest.  Cf. Conagra, Inc. v. Singleton, 743 F.2d 1508, 1511 (11th Cir. 1984) (plaintiff's interest in trademark derived entirely from predecessor company that it had acquired); see generally 2 J. Thomas McCarthy, McCarthy on

---

[2]  Until its incorporation in December 1992, CBI apparently used "CARNIVAL CAJUN CLASSICS."

5

Trademarks and Unfair Competition § 16:5, at 16-7 & n.3 (1998) (explaining that an assignee of a trademark steps into the shoes of the assignor and that a company may "buy[] the trademark and associated good will of a company with an early priority date in order to pre-date the priority of a rival"). That is, it must rest on either the Mariscos Assignment or the Hi-Seas Assignment.[3]

A. The Mariscos Assignment

The Mariscos Assignment conveyed to CBSC any and all rights that Mariscos had gained from the use of the CARNIVAL mark in connection with Mariscos' sale of raw shrimp since 1980. In other words, if Mariscos would have had priority over CBI, then CBSC has priority over CBI as well because CBSC stepped into Mariscos' shoes. The issue for us to decide is whether CBI established beyond any genuine issue of material fact that it had priority over Mariscos, and thus over CBSC, with respect to the use of the CARNIVAL mark for processed seafood entrees and sauces of the type sold by CBI.

Mariscos was unquestionably the senior user with respect to raw shrimp. However, because Mariscos never produced or sold processed, ready-to-eat seafood entrees as did CBI, priority in these goods depends on the application of the "related

---

[3] CBI does not argue on appeal that either the Mariscos Assignment or Hi-Seas Assignment was invalid or ineffective. Indeed, the only arguments on appeal involve the scope of rights conveyed in each.

use" or "natural expansion" theory. As we explained in <u>Tally-Ho, Inc. v. Coast Community College District</u>, 889 F.2d 1018 (11th Cir. 1989),

> The senior user's rights may extend into uses in "related" product or service markets (termed the "related goods" doctrine). Thus, an owner of a common law trademark may use its mark on related products or services and may enjoin a junior user's use of the mark on such related uses. The doctrine gives the trademark owner protection against the use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.

<u>Id.</u> at 1023 (citations and internal quotation marks omitted); <u>see also</u> <u>Natural Footwear Ltd. v. Hart, Schaffner & Marx</u>, 760 F.2d 1383, 1406 (3d Cir. 1985) ("[O]nce one has established a common law trademark in a product, the prior use of that trademark will apply as well to the use of the same trademark on related products in ascertaining priority of use." (emphasis omitted)), <u>cert. denied</u>, 474 U.S. 920 (1985); <u>May Dep't Stores Co. v. Prince</u>, 200 U.S.P.Q. 803, 808-09 (T.T.A.B. 1978) (senior user possesses rights in mark superior to those of "a subsequent user of the same or a similar mark for any goods which purchasers might reasonably be likely to assume emanate from [senior user] in the normal expansion of its business under the mark notwithstanding that the expansion to a particular product might be subsequent in time to that of another party"); <u>see generally</u> 2 McCarthy § 16:5, at 16-7 ("When a senior user of a mark on product line *A* expands later into product line *B* and finds an intervening user,

7

priority in product line *B* is determined by whether the expansion is 'natural' in that customers would have been confused as to source or affiliation at the time of the intervening user's appearance.").

On the other hand, "a trademark owner cannot by the normal expansion of business extend the use or registration of its mark to distinctly different goods or services not comprehended by its previous use . . . where the result could be a conflict with valuable intervening rights established by another through extensive use . . . of the same or similar mark for like or similar goods and services." American Stock Exchange, Inc. v. American Express Co., 207 U.S.P.Q. 356, 364 (T.T.A.B. 1980). See, e.g., Physicians Formula Cosmetics Co. v. West Cabot Cosmetics, Inc., 857 F.2d 80, 82 n.1 (2d Cir. 1988) (defendant's prior use of mark on hard-bar soap did not extend to give defendant priority to use similar mark in connection with cosmetics and skin creams, and so intervening user with respect to cosmetics and skin creams had priority); Clark & Freeman Corp. v. Heartland Co. Ltd., 811 F. Supp. 137, 142 (S.D.N.Y. 1993) (where plaintiff had senior rights to "HEARTLAND" mark with respect to women's boots, those rights did not extend to give plaintiff priority over defendant's intervening use of "HEARTLAND" with respect to shirts, sweaters, trousers, and jackets, because at the time the intervening use began, "there was no real

likelihood that plaintiffs would bridge the gap by applying the 'Heartland' label to the types of products defendants were selling").

Thus, the determinative question is whether -- as of the time CBI began using CARNIVAL (or some variation thereof) for seafood gumbo and chicken gumbo in 1990, and as a secondary matter, as of the time CBI began using CARNIVAL for shrimp cakes, crawfish cakes, lobster cakes, and crab cakes in 1992 -- the buying public might reasonably have been confused as between CBI's products and the raw shrimp sold by Mariscos under the CARNIVAL mark. To say that such confusion would have existed is another way of saying that the market for CBI's products would have been within the realm of natural expansion for Mariscos.

Tally-Ho instructs that in examining this question for the purpose of determining priority, we apply a variant of the familiar seven-factor test that pertains to the likelihood of confusion.[4] Tally-Ho, 889 F.2d at 1027. As McCarthy explains,

---

[4] The likelihood-of-confusion test, when applied at this stage in order to determine priority where there are issues of related use, does not substitute for the likelihood-of-confusion test that controls whether infringement of the plaintiff's trademark is occurring or has occurred. These are two independent inquiries. Once priority in the use of a mark for a particular class of goods or services has been established, then it is necessary to perform the likelihood-of-confusion test, as of the current time and as between the plaintiff's current products (i.e., those that inherit the priority with respect to the previously used mark) and the allegedly infringing products of the defendant, to determine whether the plaintiff ultimately prevails in a trademark infringement litigation. See Viking Boat Co., Inc. v. Viking Camper Supply, Inc., 191 U.S.P.Q. 297, 302-03 (T.T.A.B. 1976)

"[t]he 'natural expansion' thesis seems to be nothing more than an unnecessarily complicated application of the likelihood of confusion of source or sponsorship test to a particular factual situation. If the 'intervening' use was likely to cause confusion, it was an infringement, and the senior use has the right to enjoin such use, whether it had in fact already expanded itself or not." 4 McCarthy § 24:20, at 24-39; cf. Rosenthal, A.G. v. Ritelite, Ltd., 986 F. Supp. 133, 140-44 (SDNY. 1997) (analyzing whether plaintiff's senior use of "ROSENBERG" mark with respect to china, dinnerware, glassware, and flatware extended to give plaintiff priority over intervening user in Judaica (i.e., household goods such as china commemorating Jewish culture) market, and applying a likelihood-of-confusion inquiry to determine whether Judaica products were "a natural expansion or continuation of [plaintiff's] existing product line").

The seven factors that this Circuit uses for determining the likelihood of confusion are (1) the type of mark; (2) the similarity of the two marks; (3) the similarity of the goods; (4) the identity of customers and similarity of retail outlets, sometimes called the similarity of trade channels; (5) the similarity of advertising; (6) the intent, i.e., good or bad faith, of the alleged infringer; and (7) evidence of actual

_____

(distinguishing between the relevance of the likelihood-of-confusion test at the priority stage and at the stage of determining current confusion).

confusion, if any. Tally-Ho, 889 F.2d at 1027; Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1182 (11th Cir.), cert. denied, 474 U.S. 845 (1985). Of course, when we use this test to analyze a priority question, we must consider the state of events that existed at the time the intervening use (i.e., CBI's use of CARNIVAL) commenced.[5] See Viking Boat Co., Inc. v. Viking Camper Supply, Inc., 191 U.S.P.Q. 297, 303 (T.T.A.B. 1976) ("[T]he question of natural expansion must be viewed not in light of present trade practices but rather what they were in 1961 when [the intervening user] began to do business under the mark 'VIKING'."). We conclude that there are genuine issues of material fact whether it would have been natural in 1990 for Mariscos to expand into seafood gumbo and chicken gumbo, and in 1992 for Mariscos to expand into shrimp cakes, crawfish cakes, lobster cakes, and crab cakes. Stated another way, we conclude that there are genuine issues of material fact whether there was a likelihood of confusion stemming from CBI's use of the CARNIVAL brand in 1990 in connection with seafood gumbo and chicken gumbo, and in 1992 in connection with shrimp cakes, crawfish cakes, lobster cakes, and crab cakes.

---

[5] Because there are really two separate instances of intervening use, we look both at 1990 (when CBI began selling chicken gumbo and seafood gumbo) and 1992 (when CBI began selling shrimp cakes, crawfish cakes, lobster cakes, and crab cakes).

11

We begin with the first factor of the seven-factor test. The strength of a mark depends on the logical correlation between a name and a product. Freedom Savings, 757 F.2d at 1182. If the seller of a product or service would naturally use a particular name, it is weakly protected. Id. The relationships between names and products fall into several classifications: generic, descriptive, suggestive, arbitrary or fanciful, and coined. Id. CARNIVAL would be arbitrary or fanciful as compared to raw shrimp because it is "a word in common usage applied to a service unrelated to its meaning." Id. at 1183 n.5.[6] Second, the marks are identical.[7] Third, although, on the one hand, raw shrimp is certainly different from seafood gumbo and shrimp cakes, crawfish cakes, lobster cakes, and crab cakes; on the other hand, all of these are food products

---

[6] On the other hand, the strength of the CARNIVAL mark is diminished somewhat by the fairly frequent use of the CARNIVAL mark by third parties in other markets, as demonstrated by defendant CBI. See Sun Banks of Fla. v. Sun Fed. Sav. & Loan Ass'n, 651 F.2d 311, 316 (5th Cir. 1981) (noting that the use of the word "Sun" by third parties in other lines of business tended to reduce the strength of the "SUN" mark with respect to financial services).

[7] Some evidence indicates that during its formative years, CBI used "CARNIVAL CAJUN CLASSICS" rather than "CARNIVAL." Although CARNIVAL CAJUN CLASSICS is different from CARNIVAL, the word "carnival" is the most prominent identifying feature in the former. CBI has not argued to this Court that the presence of the additional words "cajun classics" prior to 1992 undermined the similarity, though CBI does contend that references on its packaging to Louisiana separate its mark apart.

and are related to seafood.[8]  The very existence of the "related goods" or "natural expansion" doctrine contemplates that the goods need not be exactly alike, and that the senior user may reasonably expand into related goods.  Cf. J.C. Penney Co., Inc. v. Security Tire & Rubber Co., Inc., 382 F. Supp. 1342, 1344 (E.D. Va. 1974) (holding that under the natural expansion doctrine, plaintiff's priority that came from using the mark "SCAT-TRAC" in connection with bicycle tires extended to automobile tires, even though plaintiff did not actually start using "SCAT-TRAC" for automobile tires until after other parties did so).

The fourth factor involves the identity of purchasers and similarity of retail outlets.  The evidence before the district court indicated that Mariscos sold its raw shrimp to distributor Ludwig, who in turn sold it to retail outlets and wholesalers including grocery stores (e.g., Winn Dixie and Giant), fish stores, and restaurants (e.g., Red Lobster and King Fish), which in turn would sell it to end consumers in piles of raw shrimp behind seafood counters (or, in the case of restaurants, would presumably incorporate it into a prepared dish).  The evidence indicated that the name

---

[8]  As aptly noted in CBSC's brief, CBI's reasoning emphasizing the distinction between shrimp and seafood gumbo could lead to untenable distinctions such as that "the Perdue chicken company cannot prevent another's use of the PERDUE mark for chicken pot pies, the Dole citrus company cannot prevent another's use of the DOLE mark for pineapple ice cream, and the Chiquita banana company cannot prevent another's use of the CHIQUITA mark for banana cream pie."  Appellant's Initial Brief at 27.

CARNIVAL was used in connection with these sales to retail outlets and wholesalers, but not that the word CARNIVAL was used at any further stage in the distribution chain.[9] There is nothing to suggest that end users would have associated the CARNIVAL brand name with the high-quality raw shrimp sold by Mariscos. CBI sold its seafood gumbo, and later, its shrimp cakes, crawfish cakes, lobster cakes, and crab cakes, directly to retail outlets where those products would generally be purchased by end users while still in the packaging marked CARNIVAL.[10] It would

---

[9] At oral argument, counsel for CBSC asserted that the CARNIVAL mark accompanied the piles of raw shrimp that were displayed in grocery stores and fish markets for retail sale to end users. Counsel also informed us that Mariscos had sold some shrimp in retail packaging bearing the CARNIVAL name. Counsel for CBI contended in his rebuttal that these statements lacked factual support in the record. We have reviewed the summary judgment record, and find the following. First, there is no evidence that the CARNIVAL mark accompanied the piles of raw shrimp sold at retail. Second, while there is evidence to the effect that some shrimp were sold by Mariscos in one-pound retail packaging bearing the CARNIVAL name, the same evidence indicates that said retail packaging began in or around 1996, either at the initiative of CBSC after it was assigned Mariscos' rights, or only a few months before the Mariscos Assignment. In either event, retail packaging and the resultant exposure of retail consumers to the CARNIVAL name is not relevant to our analysis of priority because we must focus on the state of events that existed in 1990 and 1992. See Viking Boat, 191 U.S.P.Q. at 303 ("[T]he question of natural expansion must be viewed not in light of present trade practices but rather what they were in 1961 when [the intervening user] began to do business under the mark 'VIKING'.").

[10] The affidavit of CBI's principal said, "I have always sold Louisiana Creole or Cajun specialties that are prepared, pre-packed, ready-to-eat specialty food products. . . . I have always packaged my Carnival Brands New Orleans prepared food products in retail-type packaging. I also offer the identical products

be unlikely for any confusion of source or sponsorship to arise at the level of the end user, since the end user would never see the CARNIVAL mark used in connection with Mariscos' high-quality raw shrimp. Rather, any possible confusion could arise only at the level of the retailers or wholesalers who purchased Mariscos' shrimp in boxes bearing the name CARNIVAL, and also were in the market for CBI's products.

The district court acknowledged that "there may be some overlap between customers of the Plaintiff and the Defendant," but explained that "such overlap would be limited to a situation in which a grocery store purchased boxes of the Plaintiff's raw shrimp from Ludwig to sell in the fresh fish department and that same grocery store purchased the Defendant's prepackaged, prepared foods for resale to consumers in the frozen food department." District Court Order at 17. The court continued that "[t]his type of overlap is insignificant to the Court's likelihood of confusion analysis, in the absence of evidence which conflicts with the Defendant's characterization of its primary customers as consumers and not resellers of any kind." Id.

---

in food service quantity but always under the same name. My products are not meant to be repackaged after sale and I am not aware of a single person or entity repackaging my products for resale." An inference can be drawn from this affidavit that some food service establishments might sell CBI's products to the ultimate consumer without the CARNIVAL label affixed thereto. However, the primary way in which CBI's products appear to have reached the public is sales to grocery stores followed by sales to end users with the CARNIVAL name still attached.

Somewhat contrary to the district court opinion, the case law indicates that confusion at pre-end consumer stages of the distribution process may be actionable. See Yarmuth-Dion, Inc. v. D'ion Furs, Inc., 835 F.2d 990, 994 (2d Cir. 1987) (where designer who made fur coats sold them to department stores who then marketed them to end customers without the designer's identifying mark, it was error for district court to focus exclusively on the retail market (in which department store patrons would not recognize the designer's mark and therefore there would be no likelihood of confusion) because the wholesale market (i.e., the possibility of confusion among the department stores who bought the fur coats for resale) was relevant); Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc., 482 F. Supp. 980, 990 (SDNY 1980) (holding that where defendant did not affix the mark to its product and therefore the end consumer was never made aware of the mark, but defendant promoted the mark to wholesalers, "[t]here is no reason in law or equity why [plaintiff] would not be entitled to forestall confusion at the wholesale level. The test of course is whether one -- in this case a retailer -- who had seen [plaintiff's] product under the mark [in question], would later know the difference when presented with an identical [product] offered to him under the [confusingly similar mark]."). The forecast of evidence indicates at least some degree of overlap between the type of customers, i.e., grocery chains, restaurants, etc., who bought from Mariscos and CBI. While it may ultimately turn out that no such

16

overlap existed, and/or that there was no likelihood of confusion, we cannot say based on the current status of the record that there is no genuine issue of material fact on this point. We are hampered in our attempted review in this regard because the district court's analysis of the potential confusion at this wholesale level was limited to the cursory statements quoted above.[11]

Fifth, the evidence showed little with respect to advertising by either party in the critical time frame of 1990,[12] so the fifth factor is neutral in impact. Sixth, there is no evidence in the record that would indicate bad faith on the part of CBI's principal in his decision to use the name CARNIVAL or CARNIVAL CAJUN CLASSICS when he started doing business as a sole proprietorship in 1990. Rather, the unrebutted evidence suggests that he adopted the name to evoke the spirit of the Mardi Gras festivities in New Orleans, a city whose culture was closely associated

---

[11] On remand, the parties may wish to explore whether the purchasing agents of the commercial institutions buying Mariscos' shrimp were likely to be sophisticated businesspeople who would not be easily confused by the dual use of the CARNIVAL mark. Indeed, the case law and commentary indicate that this is frequently the case with respect to conflicting marks in wholesale markets. See Electronic Data Sys. Corp. v. EDSA Micro Corp., 23 U.S.P.Q.2d 1460, 1465 (T.T.A.B. 1992); 3 McCarthy §§ 23:101, 23:102.

[12] The declaration of James Rukin, Mariscos' principal, indicates that Mariscos engaged in some advertising of its high-quality raw shrimp but fails to give specific facts in this regard.

with the cuisine of his product. Seventh, there is no evidence of actual confusion in the relevant time frame, i.e., 1990.[13]

Based on the totality of these factors, we conclude that there are genuine issues of material fact regarding the likelihood of confusion of source, sponsorship, or affiliation with respect to Mariscos' product compared to CBI's product, at the time CBI began doing business, and two years thereafter when it began to sell processed seafood products other than gumbo. Cf. Tally-Ho, 889 F.2d at 1027 (senior use of "You and the Law" mark in connection with the title of an instructional television series in the educational telecourse market extended to the broadcast cable television market, because it was reasonable for consumers to be confused as to the relationship between the two users). The first and second factors -- the strength of the mark and the similarity of the marks -- clearly weigh in favor of CBSC. The fifth factor --

---

[13] It is at this point that the distinction between performing the likelihood-of-confusion test for purposes of determining priority via the natural expansion theory, on the one hand, and performing the likelihood-of-confusion test for purposes of determining whether current infringement has occurred, on the other hand, becomes highly significant. The former test focuses on the time frame when the intervening use began to occur -- in this case, 1990, when CBI began doing business under the CARNIVAL name with respect to chicken gumbo and seafood gumbo, and 1992, with respect to shrimp cakes, crawfish cakes, lobster cakes, and crab cakes. See Viking Boat, 191 U.S.P.Q. at 303 ("[T]he question of natural expansion must be viewed not in light of present trade practices but rather what they were in 1961 when [the intervening user] began to do business under the mark 'VIKING'."). Thus, the various instances of actual confusion occurring at the FMI Show in Chicago and at the San Francisco trade show in 1997 are not relevant.

advertising -- is neutral. The sixth and seventh factors -- intent and actual confusion -- weigh in favor of CBI. With respect to the third factor -- the similarity of the goods -- raw shrimp and seafood gumbo are not so dissimilar that confusion is unlikely; the likelihood of confusing the instant goods would seem to depend upon the other relevant factors, including the context in which the potential victim of confusion comes into contact with the goods (which implicates the fourth factor).[14] However, as we have seen, the other relevant factors are closely balanced, and there are genuine issues of material fact with respect to the fourth factor, the similarity of trade channels. In this particular case, we believe that the appropriate resolution of the remaining genuine issues of fact may be crucial to a proper disposition of this case; and we believe that further analysis by the district court in the first instance is appropriate.

B. Hi-Seas Assignment

---

[14] For example, when a retail customer in a grocery store sees a pile of raw shrimp at the fish counter, with no brand name at all, there is little likelihood that such end user would confuse the source or sponsorship of the raw shrimp with that of CBI's packaged seafood gumbo or shrimp cakes (bearing the CARNIVAL mark) even though located in another part of the same store. On the other hand, depending upon factors not yet analyzed by the district court, there may be a likelihood of confusion at the level of the retailers or wholesalers who purchased Mariscos' shrimp in boxes bearing the name CARNIVAL, and who were also in the market buying CBI's products bearing the same CARNIVAL mark.

Second, plaintiff CBSC may have obtained rights in the CARNIVAL mark through the Hi-Seas Assignment. Because CBSC stepped into Hi-Seas' shoes, CBSC's priority depends on the priority as between Hi-Seas and CBI. Hi-Seas began using the CARNIVAL mark in June 1992 for fresh frozen shrimp, cooked shrimp, breaded shrimp, cooked crawfish, and breaded alligator. At that time, CBI had been operating since 1990 as an unincorporated sole proprietorship, and had been selling chicken gumbo and seafood gumbo. However, at that time, CBI had not yet expanded into other processed seafood products.[15]

Because CBI was using the CARNIVAL mark before Hi-Seas with respect to a different good, priority as between CBI and Hi-Seas turns on the same "natural expansion" concept that was explored supra in the context of Mariscos' priority and the Mariscos Assignment. That is, CBI is unquestionably the senior user with respect to seafood and chicken gumbo. The senior user's, i.e., CBI's, priority "may extend into uses in 'related' product or service markets," i.e., the market for the products sold by Hi-Seas, because a trademark owner has protection "against the use of its mark on any product or service which would reasonable be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or

_____

[15] CBI expanded into other processed seafood products, in particular shrimp cakes, crawfish cakes, lobster cakes, and crab cakes, in December 1992.

sponsored by, the trademark owner." Tally-Ho, 889 F.2d at 1023 (internal quotation marks omitted). If Hi-Seas' product was one into which CBI could have naturally expanded, then CBI could have enjoined Hi-Seas at that time, and CBI would have priority. The issue is whether -- when Hi-Seas started using the CARNIVAL mark in June 1992 for fresh frozen shrimp, cooked shrimp, breaded shrimp, cooked crawfish, and breaded alligator -- there was a likelihood of confusion as between Hi-Seas' products and CBI's seafood gumbo which had been sold under the CARNIVAL mark since 1990. The existence of such likelihood of confusion, in turn, is determined by applying the familiar seven-factor test to Hi-Seas and CBI as of June 1992.

The district court disregarded the Hi-Seas Assignment on the ground that "[a]ny rights received by Plaintiff via the assignment are legally insignificant . . . because [the record] indicates that Hi-Seas' rights to the mark extended back only to June 10, 1992 . . . . [and] [h]aving used the 'Carnival' mark since 1990 in connection with the manufacture and sale of seafood gumbo and chicken gumbo, the Defendant's rights in the mark are senior to those assigned by Hi-Seas to the Plaintiff." District Court Order at 8 n.4. This ruling implicitly assumes that the natural expansion or related goods doctrine operated to extend CBI's priority from the seafood gumbo market to the market for the products sold by Hi-Seas. However, there is nothing in the district court's order to suggest that it applied the seven-factor test in analyzing this question,

21

as directed by Tally-Ho, and we are not inclined to do so for the first time on appeal. Thus, on remand, the district court should conduct further proceedings, e.g., perform the proper analysis to decide whether there is any genuine issue of material fact as to whether the priority generated by CBI's senior use extended to give CBI priority in the use of the CARNIVAL mark in connection with the products sold by Hi-Seas.

## IV. CONCLUSION

Because we have determined that on this record, genuine issues of material fact remain outstanding regarding whether plaintiff CBSC may have derived priority (via either the Mariscos Assignment or the Hi-Seas Assignment) in the subject uses of the mark CARNIVAL, we vacate. The order granting summary judgment is vacated and the cause is remanded for further proceedings in accordance with this opinion.

**VACATED AND REMANDED.**