[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 16, 2001
THOMAS K. KAHN
CLERK

_____

No. 00-10872
_____

D.C. Docket No. 99-6511-CIV-DTKH

PLANETARY MOTION, INC.,

Plaintiff-Counter-
Defendant-Appellee,

versus

TECHPLOSION, INC.,
MICHAEL GAY a.k.a.
Michael Carson,

Defendants-Counter-
Claimants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 16, 2001)**

Before TJOFLAT and WILSON, Circuit Judges, and RESTANI*, Judge.

_____

*      Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by
designation.

RESTANI, Judge:

Planetary Motion, Inc. ("Planetary Motion" or "Appellee") sued

Techsplosion, Inc. and Michael Gay a/k/a Michael Carson (respectively

"Techsplosion" and "Carson"; collectively "Appellants") for infringement and

dilution of an unregistered trademark under Section 43(a) and (c) of the Federal

Trademark Act, 15 U.S.C. § 1051 et seq. (1994) ("Lanham Act"), and for violation

of Florida's unfair competition law.  Fla. Stat. Ann. §  495.151 (West 2000).

Finding that Planetary Motion had established priority of use and a likelihood of

confusion, the United States District Court for the Southern District of Florida

entered summary judgment in favor of Planetary Motion.  We affirm the judgment

and vacate the award of attorney fees.


**Facts**

I.  Development and Distribution of the "Coolmail" Software

In late 1994, Byron Darrah ("Darrah") developed a UNIX-based program

(the "Software") that provides e-mail users with notice of new e-mail and serves as

a gateway to the users' e-mail application.  On December 31, 1994, Darrah

distributed the Software over the Internet by posting it on a UNIX user site called

"Sunsite," from which it could be downloaded for free.  Darrah had named the

Software "Coolmail" and this designation appeared on the announcement sent to the end-users on Sunsite as well as on the Software user-manual, both of which accompanied the release.

The Software was distributed without charge to users pursuant to a GNU General Public License that also accompanied the release. A GNU General Public License allows users to copy, distribute and/or modify the Software under certain restrictions, e.g., users modifying licensed files must carry "prominent notices" stating that the user changed the files and the date of any change. After the release of the Software, Darrah received correspondence from users referencing the "Coolmail" mark and in some cases suggesting improvements. In 1995, Darrah released two subsequent versions of the Software under the same mark and also pursuant to the GNU General Public License.

In early 1995, a German company named S.u.S.E. GmbH sought permission from Darrah to include the Software in a CD-ROM package sold as a compilation of Unix-based programs. Darrah consented and, pursuant to the GNU licensing agreement, S.u.S.E. distributed the Software in its compilation product and in subsequent versions thereof. S.u.S.E. sold and continues to sell the software compilation in stores in the United States and abroad, as well as over the Internet.

II. Launch of Techsplosion's "CoolMail" E-mail Service

In 1998, Appellant Carson formed Techsplosion, for the purpose of operating a business based on an e-mail service that he had developed. On April 16, 1998, Techsplosion began offering the e-mail service on the Internet under the mark "CoolMail." Two days later, Techsplosion activated the domain name "coolmail.to" Techsplosion delivered an e-mail solicitation under the "CoolMail" mark to approximately 11,000 members of the Paramount Banner Network, an Internet advertising network, also created and operated by Carson. Techsplosion charged no fee to subscribe to the service and generated revenues through the sale of banner advertisements on its web site.

III. Planetary Motion's E-mail Service & Application for Trademark Registration

Appellee Planetary Motion is a computer software and telecommunications company that developed and owns an electronic mail service called "Coolmail." As part of its service, Planetary Motion enables a person to check e-mail via telephone without logging onto a computer. On April 24, 1998, Planetary Motion filed three intent-to-use applications to register the mark "Coolmail" with the United States Patent and Trademark Office. Though Planetary Motion was aware that Darrah's Software also bore the mark "Coolmail," it represented in its applications that it was not aware of any mark upon which its proposed registered

4

mark would infringe. Planetary Motion launched its Coolmail e-mail service to subscribers on June 8, 1998.

IV. Planetary Motion's Complaint and Subsequent Acquisition of Darrah's Rights

On April 22, 1999, Planetary Motion filed a complaint against Techsplosion. In the complaint, Planetary Motion alleged infringement of the alleged mark "Coolmail" for use in connection with e-mail services. Planetary alleged federal trademark infringement and unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as injury to business reputation and dilution under Florida Statute § 495.151.

On June 10, 1999, Techsplosion filed an Answer, Affirmative Defenses, and Counterclaims. The counterclaims alleged infringement of the mark "Coolmail" for use in connection with e-mail services. Techsplosion alleged unfair competition, false designation, description, and representation under the Lanham Act, common trademark infringement, common law unfair competition, and injury to business reputation and dilution.

In July of 1999, Planetary Motion purchased from Darrah all rights, title, and interest to the Software including all copyrights, trademarks, patents and other

5

intellectual property rights.[1]  On August 31, 1999, Planetary filed an Amended

Verified Complaint, adding a claim for dilution under Section 43(c) of the Lanham

Act, 15 U.S.C. § 1125(c), and alleging violation of trademark rights assigned from

Darrah.

V.  Disposition of Planetary Motion's Complaint

On January 31, 2000, the district court entered an Order granting Planetary

Motion's motion for summary judgment and denying Carson's and Techsplosion's

motion for summary judgment.  The district court based the Order on two findings:

(1) that the alleged mark was affixed to Darrah's software, and that Darrah's

distribution of the software over the Internet constituted a "transport in commerce,"

resulting in the creation of trademark rights and priority, and (2) there was a

likelihood of confusion because the marks "are essentially the same."  The district

court did not reach the issue of whether Techsplosion's use of "CoolMail" in

connection with its e-mail service diluted Planetary Motion's mark.

On the same date, the district court entered final judgment granting Planetary

Motion permanent injunctive relief.  See 15 U.S.C. § 1116.  The order also

---

[1]  The assignee of a trade name or service mark "steps into the shoes of the assignor."  Premier
Dental Prods. Co. v. Darby Dental Supply Co., 794 F.2d 850, 853 (3d Cir.), cert. denied, 479
U.S. 950 (1986).  Appellants do not contest the validity of the assignment from Darrah, nor do
they dispute that in purchasing rights to Darrah's software, Planetary Motion succeeded to all
rights possessed by Darrah.

awarded Planetary Motion profits and damages, as well as attorney fees and costs, pursuant to section 35 of the Lanham Act, 15 U.S.C. § 1117. The district court requested a report and recommendation from a magistrate judge fixing the amounts to be awarded.

A Notice of Appeal was filed on February 15, 2000. On February 15, 2000, Techsplosion filed an Emergency Motion to Stay Pending Appeal, reasserting that Darrah never established any rights in the alleged mark. This motion was denied on February 17, 2000.

On May 9, 2000 the magistrate judge entered his report recommending that Planetary Motion be awarded $275,508 in attorneys' fees and $6,562.34 in costs, but that its request for damages be denied for lack of specificity. Techsplosion served its appeal brief on May 22, 2000. On June 9, 2000, the district court entered an order adopting the report and recommendation in its entirety. On July 7, 2000, Techsplosion filed a Notice of Appeal from the order adopting the magistrate judge's report and recommendation.[2]

**Standard of Review**

---

[2] Planetary Motion does not appeal the district court's adoption of the recommendation of the magistrate judge denying damages.

Review of a district court's grant of summary judgment is *de novo*, with all facts and reasonable inferences therefrom reviewed in the light most favorable to the non-moving party.  Carnival Brand Seafood Co. v. Carnival Brands, Inc., 187 F.3d 1307, 1309 (11th Cir. 1999).

**Discussion**

Section 43(a) of the Lanham Act forbids unfair trade practices involving infringement of trade dress, service marks, or trademarks, even in the absence of federal trademark registration.[3]  Two Pesos, Inc.  v.  Taco Cabana, Inc., 505 U.S. 763, 768 (1992).  Section 43(a) is remedial in nature and should be interpreted and applied broadly so as to effectuate its remedial purpose.  Montgomery v. Noga, 168 F.3d 1282, 1300 & n. 29 (11th Cir. 1999)  (citing Warner Bros., Inc. v. Gay Toys,

---

[3]  Section 43(a) provides in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

Inc., 658 F.2d 76, 79 (2d Cir. 1981)).  To prevail under this section, a claimant must show (1) that it had prior rights to the mark at issue and (2) that the defendant had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two.[4]  Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 360 (11th Cir. 1997) (citing Conagra Inc. v. Singleton, 743 F.2d 1508, 1512 (11th Cir. 1984)), modified, 122 F.3d 1379 (1997).  Appellants argue that the district court erred in finding that Planetary Motion had established both elements.   Appellants also dispute the scope of injunctive relief, as well as the award of attorney fees and costs.

I.  Prior Use in Commerce

Under common law, trademark ownership rights are "appropriated only through actual prior use in commerce."  Tally-Ho, Inc. v. Coast Cmty College Dist., 889 F.2d 1018, 1022 (11th Cir. 1989) (citation omitted).  Under the Lanham Act,[5] the term "use in commerce" is defined in relevant part as follows:

---

[4]  Courts may use an analysis of federal infringement claims as a "measuring stick" in evaluating the merits of state law claims of unfair competition.  See Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C., 931 F.2d 1519, 1521 (11th Cir.), cert. denied, 502 U.S. 1005 (1991).

[5]  "In the absence of registration, rights to a mark traditionally have depended on the very same elements that are now included in the statutory definition: the bona fide use of a mark in commerce that was not made merely to reserve a mark for later exploitation."  Allard Enters., Inc. v. Advanced Programming Res., Inc., 146 F.3d 350, 357 (6th Cir. 1998).  Common law and statutory trademark infringements are merely specific aspects of unfair competition.  New West
(continued...)

9

the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. . . . [A] mark shall be deemed to be in use in commerce . . . on goods when (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce . . . .

15 U.S.C. § 1127.[6] The district court found that because the statute is written in the disjunctive (i.e., "sale or transport"), Darrah's wide distribution of the Coolmail software over the Internet, even absent any sales thereof, was sufficient to establish ownership rights in the "CoolMail" mark. Appellants contend that "transport in commerce" alone -- here, Darrah's free distribution of software over the Internet "with no existing business, no intent to form a business, and no sale under the

---

[5](...continued)
Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194, 1201 (9th Cir. 1979) (citing, inter alia, Dresser Indus., Inc. v. Heraeus Engelhard Vacuum, Inc., 395 F.2d 457, 461 (3d Cir.), cert. denied, 393 U.S. 934 (1968)).

[6]  Appellants appear to have conceded that if Darrah sent out original programs and related manuals, this would satisfy the affixation requirement:
      MR. GIGLIOTTI [counsel for Techsplosion]: [The mark] has to be on the product or on the associated documentation. It is on neither.
      THE COURT: It is not on the associated documentation[?] How about the original programs Darrah sent out and manuals that went with it, and all that material, wasn't that enough for affixation?
      MR. GIGLIOTTI: Yes, Your Honor, that is affixation; however, he did not meet the sale requirement.
R3-85-19 to 20.
      In any case, the affixation requirement is met because the Software was distributed under a filename that is also the claimed mark, was promoted under the same mark, was accompanied by a user manual bearing the mark, and was sold in a compilation under the mark.

mark" -- is insufficient to create trademark rights. Appellants' Brief at 13. Appellants' argument lacks merit.

The parties do not make clear the two different contexts in which the phrase "use in commerce" is used. The term "use in commerce" as used in the Lanham Act "denotes Congress's authority under the Commerce Clause rather than an intent to limit the [Lanham] Act's application to profit making activity." United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc., 128 F.3d 86, 92-93 (2d Cir. 1997) (citation omitted), cert. denied, 523 U.S. 1076 (1998); U.S. Const., Art. I, § 8, cl. 3. Because Congress's authority under the Commerce Clause extends to activity that "substantially affects" interstate commerce, United States v. Lopez, 514 U.S. 549, 559 (1995), the Lanham Act's definition of "commerce" is concomitantly broad in scope: "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. See also Steele v. Bulova Watch Co., 344 U.S. 280, 283-84 (1952); Larry Harmon Pictures Corp. v. Williams Rest. Corp., 929 F.2d 662, 666 (Fed. Cir.) (allowing registration for an intrastate provider of restaurant services with an undefined interstate clientele), cert. denied, 502 U.S. 823 (1991). The distribution of the Software for end-users over the Internet satisfies the "use in commerce" jurisdictional predicate. See, e.g., Planned Parenthood Fed'n of Am., Inc. v. Bucci, 42 U.S.P.Q.2d 1430, 1434 (S.D.N.Y. 1997) ("The nature of the

11

Internet indicates that establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's 'in commerce' requirement."), aff'd, 152 F.3d 920 (2d Cir.), cert. denied, 525 U.S. 834 (1998).

Nevertheless, the use of a mark in commerce also must be sufficient to establish *ownership rights* for a plaintiff to recover against subsequent users under section 43(a). See New England Duplicating Co. v. Mendes, 190 F.2d 415, 417-18 (1st Cir. 1951) (after finding "use in commerce" jurisdiction predicate satisfied, court noted that "[t]he question remains whether the plaintiff has established that he was the 'owner' of the mark, for under [15 U.S.C. § 1051] only the 'owner' of a mark is entitled to have it registered."). The court in Mendes set forth a two part test to determine whether a party has established "prior use" of a mark sufficient to establish ownership:

> [E]vidence showing, first, adoption,[7] and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark, is competent to establish ownership, even without evidence of actual sales.[8]

---

[7]   It is uncontested that Darrah adopted the mark "Coolmail" before Appellants' use of the mark in connection with their e-mail service.

[8]   This ownership test is not for the purpose of establishing the "use in commerce" jurisdictional predicate of the Lanham Act. See, e.g., Univ. of Fla. v. KPB, Inc., 89 F.3d 773, 776 n.4 (11th Cir. 1996). See supra discussion in text.

Id. at 418. See also New West, 595 F.2d at 1200.[9]

Courts generally must inquire into the activities surrounding the prior use of the mark to determine whether such an association or notice is present. See, e.g., Johnny Blastoff, Inc. v. L.A. Rams Football Co., 188 F.3d 427, 433 (7th Cir. 1999) ("The determination of whether a party has established protectable rights in a trademark is made on a case by case basis, considering the totality of the circumstances."), cert. denied, 528 U.S. 1188 (2000). Under the "totality of circumstances" analysis, a party may establish "use in commerce" even in the absence of sales. "[A]lthough evidence of sales is highly persuasive, the question of use adequate to establish appropriation remains one to be decided on the facts of each case . . . ." New West, 595 F.2d at 1200 (quoting Mendes, 190 F.2d at 418). The court in New West recognized that "mere advertising by itself may not establish priority of use," but found that promotional mailings coupled with advertiser and distributor solicitations met the Mendes "public identification"

---

[9] This ownership requirement parallels the statutory definition of "trademark": "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others . . . ." 15 U.S.C. § 1127. The Seventh Circuit has held that a higher quantum of use may be necessary to establish ownership rights under common law than under the statute because the notice function of registration is lacking. See Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 503-04 (7th Cir. 1992). In addition, the continuity of a user's commercial activities in connection with the mark is also relevant to determining whether use is sufficient to establish common law ownership. Circuit City Stores, Inc. v. CarMax, Inc., 165 F.3d 1047, 1054-55 (6th Cir. 1999) ("A party establishes a common law right to a trademark only by demonstrating that its use of the mark was 'deliberate and continuous, not sporadic, casual or transitory.'").

13

ownership requirement.  Id. at 1200.  Thus, contrary to Appellants' assertions, the existence of sales or lack thereof does not by itself determine whether a user of a mark has established ownership rights therein.[10]  Compare  Marvel Comics Ltd. v. Defiant, 837 F. Supp. 546, 549 (S.D.N.Y. 1993) (finding announcement of "Plasmer" title to 13 million comic book readers and promotion at annual trade convention sufficient to establish trademark ownership rights, notwithstanding lack of any sales) with Warnervision Entm't Inc. v. Empire of Carolina Inc., 915 F. Supp. 639, 645-46 (S.D.N.Y.) (finding toy manufacturer's promotional efforts insufficient to establish priority of use where only a few presentations were made to industry buyers, even though one resulted in a sale to a major toy retailer), aff'd in part, vacated in part, 101 F.3d 259 (2d Cir. 1996).[11]

---

[10]      Appellants cite Future Domain Corp. v. Trantor Sys. Ltd., 27 U.S.P.Q.2d 1289, 1293 (N.D.Cal.1993) for the proposition that there must be a sale in order to satisfy the "use in commerce" requirement.  Future Domain, however, turned not on the *existence* of sales but whether the extent of the purported mark owner's activities created a public association between the mark and the product.  There, the court determined that a computer software manufacturer's promotion of a mark at a trade show -- where at most 7,000 persons actually received or requested information about the mark and where no orders were taken -- was not sufficient to create such an association.  Id. at 1293-95.

[11]  Courts applying the "totality of circumstances" approach routinely have found evidence of a few sales of goods to which the mark had been affixed insufficient to establish trademark ownership.  For example, in Zazu Designs, 979 F.2d at 503-04, the plaintiff hair salon had sold a few bottles of shampoo bearing the mark "Zazu" both over the counter and mailed over state lines.  The court found that such limited sales "neither link the Zazu mark with [the plaintiff's] product in the minds of consumers nor put other producers on notice."  Id. at 503

14

Similarly, not every transport of a good is sufficient to establish ownership rights in a mark. To warrant protection, use of a mark "need not have gained wide public recognition," but "[s]ecret, undisclosed internal shipments are generally inadequate." Blue Bell, Inc. v. Farah Mfg. Co., 508 F.2d 1260, 1265 (5th Cir. 1975).[12] In general, uses that are *de minimis* may not establish trademark ownership rights. See, e.g., Paramount Pictures Corp. v. White, 31 U.S.P.Q.2d 1768, 1772-73 (Trademark Tr. & App. Bd. 1994) (finding no bona fide use in ordinary course of trade where mark was affixed to a game consisting of three pieces of paper and distributed for the purpose of promoting musical group).

We find that, under these principles, Darrah's activities under the "Coolmail" mark constitute a "use in commerce" sufficiently public to create ownership rights in the mark. First, the distribution was widespread, and there is evidence that members of the targeted public actually associated the mark Coolmail with the Software to which it was affixed. Darrah made the software available not merely to a discrete or select group (such as friends and acquaintances, or at a trade show with limited attendance), but to numerous end-users via the Internet. The Software was posted under a filename bearing the

---

[12] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit prior to October 1, 1981.

15

"Coolmail" mark on a site accessible to anyone who had access to the Internet. End-users communicated with Darrah regarding the Software by referencing the "Coolmail" mark in their e-mails. Appellants argue that only technically-skilled UNIX-users made use of the Software, but there is no evidence that they were so few in number to warrant a finding of *de minimis* use.

Third, the mark served to identify the source of the Software. The "Coolmail" mark appeared in the subject field and in the text of the announcement accompanying each release of the Software, thereby distinguishing the Software from other programs that might perform similar functions available on the Internet or sold in software compilations.[13] The announcements also apparently indicated that Darrah was the "Author/Maintainer of Coolmail" and included his e-mail address. The user manual also indicated that the Software was named "Coolmail."[14] The German company S.u.S.E. was able to locate Darrah in order to

---

[13]    Darrah testified that "[m]ost of the source files . . . have [the mark] in them. Also there's a copyright notice included with the software that has the name Coolmail. And the name of the executable file itself is Coolmail."

R2-47-Exh. 3 at 67.

[14]    Darrah:  The Coolmail name always comes with the documentation that comes with the software.
        * * *
        Q:  What documentation are you talking about?
        A:  There's a user manual that comes with it.
        * * *
                                                        (continued...)

16

request permission to use his Software in its product under the mark "Coolmail."

Appellants do not assert that S.u.S.E. was unaware that the Software was called

"Coolmail" when it contacted Darrah.

Fourth, other potential users of the mark had notice that the mark was in use

in connection with Darrah's Software. In investigating whether the mark Coolmail

existed before submitting its trademark registration application for its e-mail

service, Planetary Motion was able to discover that Darrah was using the mark to

designate his Software product.

Fifth, the Software was incorporated into several versions of a product that

was in fact sold worldwide and specifically attributed ownership of the Software to

Darrah under the "Coolmail" mark. Any individual using the S.u.S.E. product, or

competitor of S.u.S.E., that wanted to know the source of the program that

performed the e-mail notification function, could do so by referring to the user

---

[14](...continued)
```
        Q:  Does it say "Coolmail" on page 1?
        A.  Yes.
        Q:  Where does it say "Coolmail" on page 1?
        A:  At the top.
        ... and on the header of every page.
        Q:  What does it say, exactly?
        A:  I'm not sure if it says this verbatim, it's "Coolmail," space, then the version number.
```

R2-47-Exh. 3 at 68, 72 to 73.

manual accompanying the product.[15]  There is no support for the argument that for a trademark in software to be valid, the mark must appear on the box containing the product incorporating it, that the mark must be displayed on the screen when the program is running, or that the software bearing the mark be a selling point for the product into which it is incorporated.  There is no requirement that the public come to associate a mark with a product in any particular way or that the public be passive viewers of a mark for a sufficient public association to arise.

Sixth, software is commonly distributed without charge under a GNU General Public License.  The sufficiency of use should be determined according to the customary practices of a particular industry.  See S. Rep. 100-515 at 44 (1988) ("The committee intends that the revised definition of 'use in commerce' [see note 13, *supra*] be interpreted to mean commercial use *which is typical in a particular industry*.") (emphasis added).  That the Software had been distributed pursuant to a

---

[15]    The user manual for the S.u.S.E. Linux 4.3 product includes a list of application packages that contains the following attribution:

> **coolmail** "Cool" XBiff Clone
> Shows if new mail has arrived.  The main advantage of this program is that you can click into the window to fire up the mailer of your choice.
> Docu: man coolmail
> **Copyright**:    (c) 1994 Byron C.  Darrah
> **Author**:    Byron C.  Darrah <darrah@kaiwan.com>, Randall K.  Sharpe
> <rsharpe@ncsa.uiuc.edu>
> **Version**:    1.3

Supp. Exh. 1 at 14-72 and 42-110.

18

GNU General Public License does not defeat trademark ownership, nor does this in any way compel a finding that Darrah abandoned his rights in trademark. Appellants misconstrue the function of a GNU General Public License. Software distributed pursuant to such a license is not necessarily ceded to the public domain and the licensor purports to retain ownership rights, which may or may not include rights to a mark.[16]

Appellants cite Heinemann v. General Motors Corp., 342 F. Supp. 203 (N.D. Ill. 1972), aff'd, 478 F.2d 1405 (7th Cir. 1973), for the proposition that Darrah was a "hobbyist" unworthy of common law trademark protection. Heinemann is factually distinguishable from the case at hand. The plaintiff in Heinemann used a mark in connection with his automobile before an automobile manufacturer independently had adopted the same name for a new model. The court held that the plaintiff had not established common law ownership rights based on two findings. First, the court found that because Heinemann's purpose in using the mark was to "open [at a later date] an automobile equipment shop which would have capitalized upon the slogan," he merely attempted to "reserve a trade or service mark pending the creation of a trade or business . . . ." 342 F. Supp. at 207.

---

[16] Because a GNU General Public License requires licensees who wish to copy, distribute, or modify the software to include a copyright notice, the license itself is evidence of Darrah's efforts to control the use of the "CoolMail" mark in connection with the Software.

The court reasoned as follows:

> While the law does not require a nationwide business; an old, established business; or even a profitable business for the acquisition of property interests in trade or service marks, it does require a *presently existing* trade or business for such acquisition. The exhibits disclose that Plaintiff had only a desire to open a business *in futuro*. To hold otherwise would make a trade mark a property right in gross, instead of a right appurtenant.

Id. (emphasis in original). The Heinemann court also found that plaintiff Heinemann's activities consisted merely of occasionally racing or displaying the automobile at fairs as a hobby, as evidenced by his testimony that he was employed at an oil company. Id. Here, Darrah did not attempt to "warehouse" the mark by promoting a product he merely *intended* to develop and distribute at a later date. Darrah's use of the mark to designate the distributed Software and each subsequent version thereof indicates that his use was not mere sporadic or token use.[17] Furthermore, unlike Heinemann, Darrah activities pertained to his chosen

_____

[17] Appellants contend that the district court erred in "ignoring" the first sentence of the present definition of "use in commerce" ("the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark"), which was added pursuant to the Trademark Law Revision Act of 1988 ("Revision Act"), Pub. L. No. 100-667, 102 Stat. 3935 (1988). The court in Allard found that a magistrate judge's reliance on case law that antedated the revision was proper because the language of the revised definition is "entirely consistent with the traditional rules governing common-law ownership of trademarks." 146 F.3d at 357. The Allard court noted that "the purpose of this revision 'was to eliminate 'token use' as a basis for registration, and that the stricter standard contemplates instead commercial use of the type common to the particular industry in question.'" Id. (citation omitted).

    The reason "token use" was expressly eliminated was that the Revision Act had created an "intent-to-use" application system that rendered such a "commercial sham" unnecessary. See

(continued...)

20

profession.   Darrah is employed as a computer systems administrator, which entails the management and oversight of computer networks and systems as well as the development of software in support thereof.

Appellants also rely on DeCosta v. Columbia Broad. Sys., Inc., 520 F.2d 499, 513 (1st Cir. 1975), cert. denied, 423 U.S. 1073 (1976), to argue that Darrah is an eleemosynary individual and therefore unworthy of protection under unfair competition laws.  The DeCosta court did not hold that the that the absence of a profit-oriented enterprise renders one an eleemosynary individual, nor did it hold that such individuals categorically are denied protection. Rather, the DeCosta court expressed "misgivings" of extending common law unfair competition protection, clearly available to eleemosynary organizations, to eleemosynary individuals.[18]

Id.  The court's reluctance to extend protection to eleemosynary individuals was

---

[17](...continued)
134 Cong. Rec. 32,053 (Oct. 20, 1988) (Sen. DeConcini).  The revision did *not* alter the meaning of the phrase "sold or transported in commerce" or in any way increase the quantum of use necessary to acquire trademark ownership as developed by common law.  See id. ("Congress' intent that the revised definition still encompass genuine, but less traditional, trademark uses must be made clear.  For example, such uses as clinical shipments of a new drug awaiting FDA approval, test marketing, or infrequent sales of large or expensive or seasonal products, reflect legitimate trademark uses in the normal course of trade and are not to be excluded by the House language.").  There is no evidence to support the contention that Darrah's purpose was merely to secure trademark rights to reserve the mark for future use.

[18]  It is unlikely that the plaintiff's activities in De Costa -- costumed performances and distribution of his picture at local rodeos, parades, hospitals, etc. -- would generate a "public association" sufficient to confer him common law trademark ownership rights.  The court assumed *arguendo*, however, that the plaintiff's activities did warrant protection, and went on to find that the evidence did not support a finding of likelihood of confusion.

based on an apparent difficulty in establishing a line of demarcation between those eleemosynary individuals engaged in commerce and those that are not. But as the sufficiency of use to establish trademark ownership is inherently fact-driven, the court need not have based its decision on such a consideration. Mendes, 190 F.2d at 418. Common law unfair competition protection extends to non-profit organizations because they nonetheless engage in *competition* with other organizations.[19] See Girls Clubs of Am., Inc. v. Boys Clubs of Am., Inc., 683 F. Supp. 50 (S.D.N.Y. 1988), aff'd, 859 F.2d 148 (2d Cir.). Thus, an eleemosynary individual that uses a mark in connection with a good or service may nonetheless acquire ownership rights in the mark if there is sufficient evidence of competitive activity. [20]

---

[19] The DeCosta court recognized that "the law of unfair competition . . . protects 'eleemosynary organizations (which) function in commerce and, in form, resemble business enterprises . . . . The happenstance that they are nonprofit-seeking ventures, and therefore removed, as such, from the rigors of business competition, neither eliminates the element of competition nor disentitles them to protection against the unfair competition of similar organizations.'" 520 F.2d at 512 (quoting Callman, Vol. 1, s 1.1, p. 4).

[20] The DeCosta court noted that

[common law unfair competition] [p]rotection at present has the merits of inherent limitations: the existence of a trade, business, or profession where the 'good will' to be protected has been subject to the acid test of the willingness of people to pay for goods or services; or, in the case of nonprofit institutions, the voluntary investment in time, effort, and money of many individuals to create and maintain a program of sufficient interest to consumers, members, and sponsors to warrant protection.

(continued...)

22

Here, Darrah's activities bear elements of competition, notwithstanding his lack of an immediate profit-motive. By developing and distributing software under a particular mark, and taking steps to avoid ceding the Software to the public domain, Darrah made efforts to retain ownership rights in his Software and to ensure that his Software would be distinguishable from other developers who may have distributed similar or related Software. R2-47-Exh. 3 at 67. Competitive activity need not be fueled solely by a desire for direct monetary gain. Darrah derived value from the distribution because he was able to improve his Software based on suggestions sent by end-users. Just as any other consumers, these end-users discriminate among and share information on available software. It is logical that as the Software improved, more end-users used his Software, thereby increasing Darrah's recognition in his profession and the likelihood that the Software would be improved even further.

In light of the foregoing, the use of the mark in connection with the Software constitutes significant and substantial public exposure of a mark sufficient to have

---

[20](...continued)
520 F.2d at 513.

We find that such an "inherent limitation," if it in fact exists, is inapplicable in this context. One individual can invest time, effort and money in developing software or other technologically-based goods or services that would be of interest to a multitude of users, other developers, and retail establishments. In fact, the program was of sufficient interest for S.u.S.E. to put effort into including it in its own software which was sold for profit, including the effort of obtaining Darrah's permission under the GNU General Public License.

created an association in the mind of public.

## II. Likelihood of Confusion

The district court supported its determination of "likelihood of confusion" with the following findings: (1) the mark used by Planetary Motion ("Coolmail") is "essentially the same" as that used by Techsplosion ("CoolMail")[21]; (2) both marks are used in connection with e-mail services; (3) both plaintiff and defendants serve e-mail customers via the Internet; and (4) both use the Internet to promote their services. R2-62-7.[22] Appellants do not dispute the accuracy of these findings. Rather, Appellants claim the district court improperly based its analysis on a comparison of the parties' respective e-mail services, rather than on a comparison of

---

[21] The Ninth Circuit in Brookfield Communications, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1055 (1999), explained that the domain name "moviebuff.com" was virtually identical to "MovieBuff," because "Web addresses are not caps-sensitive."

[22] This Court considers the following seven factors in assessing whether or not a likelihood of consumer confusion exists: (1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets (trade channels) and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion. See Lone Star, 122 F.3d at 1382. Of these, the type of mark and the evidence of actual confusion are the most important. See Dieter v. B & H Indus. of Southwest Fla., Inc., 880 F.2d 322, 326 (11th Cir. 1989), cert. denied, 498 U.S. 950 (1990). In this case, there is evidence that end-users subscribed to Techsplosion's e-mail service under the impression they were subscribing to Planetary Motion's service. See R2-46-Exh. 1-G.

24

Techsplosion's "CoolMail" e-mail service to the "Coolmail" *Software*. Appellants argue that the latter comparison is required because Planetary Motion acquired its rights to the "Coolmail" mark by assignment of rights in Darrah's Software, and under the "natural expansion" doctrine this is a use unrelated to Planetary Motion's current use of e-mail services. Thus, Appellants' argument in essence goes to whether the scope of trademark protection enjoyed by Planetary Motion extends from the initial use (in connection with the Software) to the current use (in connection with Planetary Motion's e-mail services).

The scope of protection enjoyed by a trademark owner is not restricted to the owner's original use. The "natural expansion" doctrine is applied to determine the proper scope of protection where a mark owner's previous use differs from its current use, and the junior use intervenes. Under this doctrine, the first trademark owner's rights are limited to goods on which the mark has already been used or that lie within the realm of natural expansion; "[t]his appears to be no more than a specific application of the familiar 'related goods' test." J. McCarthy, § 24:20.[23]

_____

[23]  The theory of "natural expansion" as applied to determinations of the scope of protection "relates to a situation where the senior user of mark A on product line X expands use of mark A to product line Z and conflicts with an 'intervening junior user' who has already been using mark A on product line Z." J. McCarthy, § 24:20. This differs from the "natural expansion" doctrine as applied to determining the geographical delimitation of common law trademark rights. See id. § 26:20; Tally-Ho, 889 F.2d at 1023, 1027-29.

The 'natural expansion' thesis seems to be nothing more than an unnecessarily
(continued...)

25

See also Carnival, 187 F.3d at 1310-11.

The court in Tally-Ho explained that a senior user's rights "may extend into uses in 'related' product or service markets (termed the 'related goods doctrine'),'" and that "an owner of a common law trademark may use its mark on related products or services and may enjoin a junior user's use of the mark on such related uses . . . ." 889 F.2d at 1023 (citing J. Mc.Carthy, § 24:1 to 24:12).   This rule is limited by equitable considerations.  The court in Carnival noted that "[A] trademark owner cannot by the normal expansion of its business extend the use or registration of its mark to *distinctly different* goods or services not comprehended by its previous use . . . where the result could be a conflict with *valuable intervening rights established by another through extensive use . . .* of the same or similar mark for like or similar goods and services."  187 F.3d at 1310-11 (citations and internal quotation marks omitted) (emphasis added).

Courts determine the proper scope of protection of a mark in the context of intervening uses by applying the "source or sponsorship" test.  Under this test, a

---

[23](...continued)
 complicated application of the likelihood of confusion of source or sponsorship test to a particular factual situation.  If the intervening use was likely to cause confusion [with respect to the mark owner's previous use], it was an infringement and the senior user has the right to enjoin such use, whether it had in fact already expanded itself or not.

J. McCarthy, § 24:20.

trademark owner has "protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." J. McCarthy, § 24:6. The public perception in this regard is determined at the time the junior user first used the mark on the product or service to which the allegedly infringing mark is affixed.[24] Carnival, 187 F.3d at 1312. The court in Tally-Ho explained that "related use" is "merely a facet of the likelihood of confusion test and therefore requires an inquiry into [the] seven factors affecting the likelihood of confusion . . . ."[25] 889 F.2d at 1027.

---

[24] Techsplosion, the junior user in this case, first used the mark "CoolMail" in connection with its e-mail service in April 16, 1998, before Planetary motion filed its intent-to-use application.

[25] The court in Carnival explained the "source or sponsorship" inquiry in this context as follows:

> The likelihood-of-confusion test, when applied at this stage in order to determine priority where there are issues of related use, does not substitute for the likelihood-of-confusion test that controls whether infringement of the plaintiff's trademark is occurring or has occurred. These are two independent inquiries. Once priority in the use of a mark for a particular class of goods or services has been established, then it is necessary to perform the [liability stage] likelihood-of-confusion test, as of the current time and as between the plaintiff's current products (i.e., those that inherit the priority with respect to the previously used mark) and the allegedly infringing products of the defendant, to determine whether the plaintiff ultimately prevails in a trademark infringement litigation.

187 F.3d at 1311, n. 4 (citation omitted).

Thus, evidence supporting a finding of "related use" need not rise to the level of finding likelihood of confusion for the purposes of establishing liability, but may nonetheless serve as a guide for determining the scope of protection.

27

We find that the relatedness between e-mail notification software and a service that allows users to check e-mail via telephone line is not so attenuated that the district court mistakenly failed to limit Planetary Motion's rights in the mark to its use in connection with the Software. Consumers reasonably could attribute the Software and an e-mail service under the same name to the same source for several reasons.[26] Both the Software and the e-mail service belong to the same general field of commerce, i.e., information technology, and both deal more specifically with e-mail.[27] Appellants do not dispute Planetary Motion's contention that major firms in this field sell e-mail software as well as provide e-mail service.[28] See Darrah Affidavit, R2-46-Exh. 2 at ¶ 34. Both the Software and the e-mail service

---

[26] The extension of Planetary Motion's rights to the mark in connection with its e-mail service does not, as Appellants assert, hinge on whether Darrah intended to launch, or even was capable of launching, an e-mail service similar to those of the parties. For goods or services to be "related," they need not have exactly the same customer base or be in direct competition with one another.

[27] Cf. Commerce Nat'l Ins. Servs., Inc. v. Commerce Insurance Agency, Inc., 214 F.3d 432, 438, 441-43 (3d Cir. 2000). The court in Commerce Nat'l found clear error in the district court's "likelihood of confusion" analysis that had been based "primarily on the assumption that banking and insurance are similar industries in the minds of consumers and that consumers would expect banks to expand into the insurance industry," where evidence of such perception consisted of an affidavit and an "unpersuasive report" and where state law limited banks from engaging in the general insurance industry. 214 F.3d at 441.

[28] See Scarves by Vera, Inc. v. Todo Imports, Ltd., 544 F.2d 1167, 1174-75 (2d Cir. 1976). The court in Scarves by Vera found a use of mark on cosmetics to infringe on use on apparel and household linens, even though plaintiff had no plans to enter the former market. The court reasoned that other fashion designers were commonly involved in both markets, such that customers would likely assume that defendant's use was a similar expansion by plaintiff.

28

involve sending messages over the Internet:  the former provides a functionality that enables a user with e-mail capability to receive notification of new mail, and the latter enables subscribers to the service to send and receive e-mail.   Both the Software and the e-mail service were promoted over the Internet to those who make use of e-mail.

Furthermore, the equities do not necessarily favor Techsplosion.[29] Techsplosion's "CoolMail" e-mail service had not been in operation for an extended period of time before Planetary Motion entered the market under the name "Coolmail," and Planetary Motion is not merely attempting to reserve the mark for a future business endeavor.  Accordingly, we sustain the district court's finding of "likelihood of confusion."

III.  Relief

Review of the district court's award of injunctive relief, attorney's fees and costs is for abuse of discretion.  See Burger King Corp. v. Weaver, 169 F.3d 1310,

---

[29]   See Rosenthal A.G. v. Rite Lite, Ltd, 986 F. Supp. 133, 141 (E.D.N.Y. 1997) ("[A]bsent equities in a defendant's favor, courts should enjoin defendants 'from using a similar trademark whenever the non-competitive products are sufficiently related that customers are likely to confuse the source of origin.'") (citation omitted).  The court in Rosenthal, relying on "undisputed evidence and basic common sense," found the two markets at issue to be sufficiently related and noted that the equities did not tip in the defendant's favor where the plaintiff had in fact entered the defendant's market.  Id. ("[T]he interest at stake is more than plaintiff's interest in being able to enter a related market at some future time . . . .").

1315 (11th Cir.), <u>cert. dismissed</u>, 528 U.S. 948 (1999); <u>Tally-Ho</u>, 889 F.2d at 1022.

A. <u>Injunctive Relief</u>

Appellants assert that the injunctive relief awarded by the district court is impermissibly vague and overbroad. Appellants contend that the language "imposes a grossly unfair burden on Techsplosion, as it does not allow for a determination of what is and is not permitted under the injunctive provisions." Appellants' Brief at 40. Federal Rule of Civil Procedure 65(d) states in relevant part: "Every order granting an injunction . . . shall be specific in terms [and] shall describe in reasonable detail . . . the act or acts sought to be restrained . . . ."[30] Fed. R. Civ. P. 65(d). A clear and unambiguous order is one that leaves "'no uncertainty in the minds of those to whom it is addressed,' . . . who must be able to ascertain from the four corners of the order precisely what acts are forbidden.'" <u>King v. Allied Vision, Ltd.</u>, 65 F.3d 1051, 1058 (2d Cir. 1995) (citations omitted). Optimally, the injunction

> should clearly let defendant know what he is ordered to do or not to do. A court order should be phrased in terms of objective actions, not legal conclusions. An injunction which *merely* forbids a defendant from performing "acts of unfair competition," or from "infringing on

---

[30] Three considerations underlie the specificity requirements of Rule 65(d): "to prevent uncertainty and confusion on the part of those faced with injunctive orders, . . . to avoid the possible founding of a contempt citation on a decree too vague to be understood . . . [and] for an appellate tribunal to know precisely what it is reviewing." <u>Schmidt v. Lessard</u>, 414 U.S. 473, 476-77 (1974) (per curiam).

plaintiff's trademarks and trade secrets" adds nothing to what the law already requires.

John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 984-985 (11th Cir. 1983) (quoting J. McCarthy, at § 30.13) (emphasis added).

Notwithstanding these strictures, appellate courts do not set aside injunctions under Rule 65(d) "unless they are so vague that they have no reasonably specific meaning." E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1297 (9th Cir. 1992). Rather than applying Rule 65(d) rigidly, appellate courts determine the propriety of an injunctive order by inquiring into whether the parties subject thereto understand their obligations under the order. Williams v. City of Dothan, 818 F.2d 755, 761 (11th Cir. 1987) (citing Combs v. Ryan's Coal Co., 785 F.2d 970, 978-79 (11th Cir.), cert. denied sub nom. Simmons v. Combs, 479 U.S. 853 (1986)), modified, 828 F.2d 13 (11th Cir. 1987). Furthermore, the degree of particularity required depends on the nature of the subject matter. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191-92 (1949) (decrees of generality are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown) .

Here, although several parts of the order are phrased in terms of legal conclusions, the order, read as a whole, clearly indicates what Techsplosion is

forbidden from doing.[31]  According to the order, Techsplosion is permanently

enjoined from using the name "Coolmail" in connection with "e-mail or other

Internet-related services," in connection with software, and as part of the domain

name of its website.  These limitations sufficiently define the scope of the

injunction and give context to the arguably legally conclusory language included

therein.  Furthermore, the use of "any similar mark" after references to "Coolmail"

does not detract from this level of specificity.  See Planned Parenthood, 152 F.3d

920 (upholding preliminary injunction that prohibited defendant from using mark

or "any colorable imitation of [that] mark" anywhere on the Internet and from

---

[31]   The injunction reads, in relevant part as follows:
[Techsplosion is] permanently enjoined from (a) Using the name "Coolmail," or any similar mark, in connection with the offer, promotion, distribution, sale, advertisement or provision of services relating to e-mail or other Internet-related services; (b) Using the name "Coolmail," or any similar mark, in connection with the offer, promotion, distribution, sale, advertisement or provision of software; (c) Using Coolmail.com as the domain name of their website; (d) Using any logo, trade name, trademark or servicemark which may be calculated to represent falsely that the services or products of defendants are affiliated, connected, or associated with Planetary Motion; (e) Using any logo, trade name or servicemark which may be calculated to falsely represent that the services or products of defendants are sponsored by, authorized by, approved by, or originate from Planetary Motion; (f) Using the name "Coolmail" in any fashion that would damage the business reputation of Planetary Motion, or any of its successors, assigns, affiliates, subsidiaries, or parents, or that would dilute the value of the "Coolmail" mark; (g) Otherwise infringing on the "Coolmail" mark; (h) Unfairly competing with Planetary Motion; and Aiding, abetting or assisting any other person or entity in engaging in or performing any activities stated in paragraphs (a) through (h) above.

R2-63.
Sections (g) and (h) are conclusory catch-all provisions.  Although sections (d) through (f) use legal terminology, they are linked to Planetary Motion and its rights in the "Coolmail" mark such that Techsplosion likely will not violate the injunction if it completely ceases the use of "Coolmail" in connection with e-mail services or markets related thereto.

32

taking actions "likely to cause confusion" among Internet users regarding Planned Parenthood's endorsement or sponsorship of defendant's site).  Appellants do not propose any reading of the language in the injunction that would impermissibly prohibit conduct that Techsplosion arguably has the right to do.  Cf. B. H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1269 (5th Cir. 1971) (finding injunction impermissible where broad reference to opinion's findings of fact "[appeared to] enjoin perfectly legal acts").  But see AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1547- 48 (11th Cir. 1986) ("An injunction can be therapeutic as well as protective.  In fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable.") (citation omitted), cert. denied, 481 U.S. 1041 (1987).  Nor do Appellants explain how the wording of the injunction could lend itself to alternate interpretations.  In the absence of any apparent contextual ambiguities or alternate readings prohibiting legal conduct, it is unlikely that Appellants will misapprehend what conduct is proscribed, or will incur liability to contempt citations for activities not contemplated by this order.

    B.  Attorney Fees

Awards of attorney fees are reviewable only to determine if the trial court

abused its discretion in granting or denying them.[32]  See St. Charles Mfg. Co. v.

Mercer, 737 F.2d 891, 894 (11th Cir. 1983).  Fla. Stat. § 495.151 provides for

injunctive relief only.  Under Section 35(a) of the Lanham Act, however, courts

may award reasonable attorney fees to the prevailing party "in exceptional cases."

15 U.S.C. § 1117(a).  See also Montgomery, 168 F.3d at 1304.  Exceptional cases

are those where the infringing party acts in a "malicious, fraudulent, deliberate, or

willful manner."  Burger King Corp. v. Pilgrim's Pride Corp., 15 F.3d 166, 168

(11th Cir. 1994) (quoting S.R. Rep. 93-1400 (1974), reprinted in 1974

U.S.C.C.A.N. 7132, 7133) (internal quotation marks omitted).

Here, the district court awarded attorney fees without articulating a basis for

doing so, let alone the factual circumstances that would warrant such an award.[33]

Furthermore, there is nothing in the  record to support a finding of  "malicious,

fraudulent, deliberate, or willful" conduct on the part of Planetary motion.

Remand is therefore unnecessary on this issue.   Accordingly, we find that the

award of attorney fees is an abuse of discretion and vacate the award.

[32]   As Techsplosion timely filed an appeal from the order fixing the amount of attorney fees
and costs, and we may reach the issue.  See Budinich v. Becton Dickinson & Co., 486 U.S. 196,
202-203 (1988).

[33]  Planetary Motion asserts that Techsplosion learned in early 1999 of its use of the "Coolmail"
mark, and that "Planetary Motion possessed senior rights in the Coolmail mark."   Since
Techsplosion reasonably could have assumed that Planetary Motion lacked priority in the mark,
such knowledge in this case does not invariably give rise to a finding of deliberate or malicious
infringement.

34

c.  Award of Costs

Under the Lanham Act, a successful party "subject to the principles of equity" may recover:  "(1) defendant's [the infringer's] profits; (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).  See Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1182 (11th Cir. 1994).  To recover costs under the Lanham Act, therefore, a plaintiff need not establish that the alleged infringer acted maliciously, fraudulently, deliberately, or willfully.  Because it was within the district court's discretion to award costs, and in the absence of any evidence that would warrant a finding that the balance of equities necessarily tipped in favor of Techsplosion, we uphold the award of costs to Planetary Motion.

**Conclusion**

Accordingly, the district court's order and final judgment are AFFIRMED, except that the order adopting the magistrate judge's report and recommendation, with respect to the award of attorney fees, is VACATED.